## UNITED STATES et al. v. BOYKIN.
### No. 6140.

Circuit Court of Appeals, Fifth Circuit.

May 1, 1931.

Fred Cubberly, U. S. Atty., and G. E. Hoffman, Asst. U. S. Atty., both of Pensacola, Fla., and Edouard F. Henriques, Sp. Asst. in Admiralty to U..S. Atty., of New Orleans, La., for appellants.

Simone N. Gazan, of New York City (Simone N. Gazan, of New York City, and Ernest E. Mason, of Pensacola, Fla., on the brief), for appellee.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

The appellee, Edward R. Boykin, as administrator of the estate of John W. Boykin, recovered for his own use as surviving parent a sum of $9,000 as damages for the death of the deceased while serving as a seaman on the steamship Antinous. The libel in personam was brought under 46 USCA § 688 against the United States and the United States Shipping Board Merchant Fleet Corporation as owners of the ship. The vessel had a cargo of wheat under the hatches, and a deck load of heavy timbers covering to a depth of six feet the forward well deck, being held down with chains, and having a wire cable strung near each edge of the deck load as a temporary rail. Several ventilators came up from the hold through the deck load. The vessel was caught off the coast of Florida on September 27, 1927, in a hurricane, and during that night she was swept by heavy seas which carried away the plugs and canvas covers with which the ventilator trunks had been covered. They were all replaced save on the port ventilator just forward of the bridge, the plug for which was lost and the trunk of which was temporarily covered by lashing a tarpaulin over it. It was important to prevent water from entering through it into the hold, not only to preserve the cargo from damage, but also lest the wheat by swelling should force open the plates of the vessel. By 8:20 a. m. the carpenter had made a new plug, and the boatswain called Boykin and two other seamen to go with him out upon the deck load to insert the plug and make fast a cover over it. The wind was unabated, and blowing eighty or eighty-five miles per hour. The seas were high, and breaking in spray over the vessel, which was headed almost directly into them and taking them on her port bow. There were no life lines strung along the center or athwart the deck load. No notice seems to have been given by the boatswain to the officers in the pilot house or on the bridge of the exposure of these men, but they were in plain view of the third mate, who was on the bridge. Neither the course nor the speed of the vessel was altered. Two of the men went down into the space between the ends of the timbers and the bulkhead of the amidship house to reach the ventilator trunk, while Boykin and the boatswain were on the timbers assisting with the plug. Just as it was inserted, a very high sea, referred to as a tidal wave, appeared in front of the vessel. It was seen by the master from the pilot house at a distance estimated as much as three-quarters of a mile away, and at a time fixed as from two to four minutes before it reached the ship. It appearing to be dangerous, the master directed the third mate, who was keeping watch on the bridge, to warn any one who might be on the deck. The mate could see

the seamen at work, and ran first to the starboard end of the bridge and shouted to them, but could not be heard against the wind, and then ran to the port end and got their attention, but only as the sea boarded the ship. It flooded the deck to a depth of about twenty feet, and almost swept the mate from the bridge. One of the men, though injured, was saved, but the boatswain and Boykin and the third seaman were washed overboard and lost, though search was made for them for thirty-six hours afterwards. The chains of some of the deckload were snapped, and about two hundred of the sticks of timber carried away.

■ The absence of life lines is charged as negligence, but it is doubtful if they would have been of any efficacy, since the timber carried away the starboard line rail. It is also contended that the ship should have been brought around with her stern to the seas so as to protect the forward deck while the ventilator was covered, but the danger of taking the seas on the beam while making the turn would have been very great. We think, however, there was clear negligence in undertaking the work without further checking of the ship's speed, which the witnesses agree would have enabled her to meet the seas better, and especially without keeping a better lookout for the very thing that happened, and in not giving more effectual warning of it. Great seas had swept the ship during the night, and were likely to be met again at any time; yet no one was on special lookout for these men. The officers on the bridge saw the danger coming, but delayed the warning until it was too late to be effectual. A seaman is bound to obey, and Boykin was acting under direct orders of a superior in exposing himself to danger. There was no assumption of the risk, although the danger may have been obvious to him. Panama R. R. Co. v. Johnson (C. C. A.) 289 F. 964, 965; Zinnel v. U. S. Shipping Board E. F. Corp. (C. C. A.) 10 F. (2d) 47; Masjulis v. U. S. Shipping Board E. F. Corp. (C. C. A.) 31 F.(2d) 284, 285. We think liability is established.

■ The deceased left no wife or children, so the recovery is for the use of his father, his sole surviving parent, 45 USCA § 59, and is measured by the father's actual pecuniary loss, Kansas City R. R. v. Leslie, Adm'r, 238 U. S. 599, 35 S. Ct. 844, 59 L. Ed. 1478; Norfolk & Western Ry. Co. v. Holbrook, 235 U. S. 625, 35 S. Ct. 143, 59 L. Ed. 392, reduced to present value, Chesapeake & Ohio Ry. Co. v. Kelly, Adm'x, 241 U. S. 485, 36 S. Ct. 630, 60 L. Ed. 1117. The father was 44 years old, and the deceased 23. The father's life expectancy, being the shorter, is the more important to consider. He testifies the deceased was earning $67 per month above his keep, and had allotted to his father $20.00 per month, and often gave him more. He elsewhere testified that his son gave him $35.00 or $40.00 a month as a rule, as near as he could figure it. The father was himself at work, and not entirely dependent. While it was likely under the proven circumstances that the son would have come to earn more, it is also probable that he would have married and had other obligations. We see no good reason to conclude that he would have contributed to his father more than an average of $450 per year. The present value by standard tables of an annuity of $450 for the lifetime of the father with money put at 6 per cent. is around $5,200. That we fix as a fair limit of recovery, and direct that the decree be modified by reducing it from $9,000 to $5,200. The appellants are entitled to recover the costs of this appeal.

Modified and affirmed.