## JOHNSON v. UNITED STATES et al.

District Court, S. D. New York.
April 6, 1934.

Simone N. Gazan, of New York City, for libelant.

Martin Conboy, U. S. Atty., of New York City (Charles E. Wythe, of New York City, Sp. Asst. U. S. Atty., of counsel), for respondents.

BYERS, District Judge.

The plaintiff sues as administrator of his deceased son, Harvey H. Johnson, under the Suits in Admiralty Act of 1920 (46 USCA § 741 et seq.), to recover damages for the death of the latter, who was an able-bodied seaman on the steamship West Honaker.

The ship was being operated by the Roosevelt Steamship Co., Inc., for account of the United States Shipping Board Merchant Fleet Corporation, and was on a voyage which started in New York on March 7, 1929, destination Calcutta, and return. Departure home-bound was made from Calcutta on June 26th, and on July 9th, the date of the accident, the ship was pursuing a northwesterly course in the Indian Ocean about where it merges into the Arabian Sea.

At 5:00 o'clock in the afternoon of that day, the ship's position being in latitude 9° north, longitude 59° east, Johnson was washed overboard while attempting to make his way from the crew's quarters in the poop deck, to the mess-room in the main deck housing.

The West Honaker is a motor cargo ship with accommodations for a few passengers,

of 5,428 gross and 3,374 net tonnage. She is 410 feet long, has a beam of 54 feet, and is 27 feet in depth, of the three-island type of construction, that is to say, there is a forward and after well deck with a raised fore deck, midship house and poop deck.

The monsoon season was prevailing in the Indian Ocean, and the smooth log, which was the only deck log produced, indicates that beginning on July 5th rough head seas were encountered, and that the vessel was shipping seas over her well decks and hatches.

On the 6th, the entries are the same, namely, that there was a rough southwest sea, and that the vessel was shipping spray and occasional seas over decks and hatches; on this day, the officers could not inspect the cargo space, due to rough weather. The same entry occurs on the 7th, also the following: "Men ordered to use shaft tunnel in going aft." On the 8th the same entry occurs as to the inability to inspect cargo space; also that there was a rough sea and the ship was pitching heavily and shipping seas over decks and hatches; there was no fire and boat drill, due to rough weather.

On the 9th, the day in question, there was again a failure to inspect the cargo spaces, and the vessel was rolling and shipping seas over the well decks. At 3:00 o'clock in the afternoon, there is an entry that a ring life buoy had washed away on the port side amidships, and the vessel was in a rough beam sea, shipping seas over well decks.

The wind movement was out of the southwest at 4:00 a. m., with a force of 6 and again at 8:00 a. m. At noon and at 4:00 p. m., the force was 5.

At about 5:00 p. m., Johnson and two others of the crew appeared on the poop deck and, having been summoned to their evening meal, started for the mess-room in the midship housing, by climbing down to the well deck and going forward; one of them, Nugent, succeeded, although it was seen to be a hazardous undertaking because seas were frequently coming aboard from the port side of the ship.

Johnson started next but, on the well deck, was caught by a wave and washed over the starboard side; he at once raised the cry of "man overboard," which was heard by Sherman, the third member of the group, who went back to the poop deck and threw one or two life rings to Johnson, and then a bench which was aft on that deck. The mishap was at once made known to the bridge, where the first officer, Burkhart, was on duty.

Lambert, the master, shortly came to the bridge and took command of the vessel; he ordered a life-boat on the starboard side and then one on the port side to be made ready to be launched. In the meantime, he maneuvered the ship so as to effect, if possible, the rescue of Johnson. The waves were so high that it was impossible for several of the men who were promptly posted as lookouts, to keep Johnson in sight; the testimony seems to be that on three occasions which were separated by a number of minutes, he was observed from the ship, and was at all times swimming. During the intervals, it was not possible to keep him in view, as will be realized from the force of the sea, the height of the waves, and the rolling of the ship.

The vessel circled back to her own starboard, so that Johnson was observed on the weather side at least once during the ensuing period of fifty minutes, and, while it is impossible to state clearly just what maneuvers were performed or the exact course of the ship, she was finally brought to the weather side of Johnson and, when he was alongside, perhaps 30 feet away, an oiler, Skocylas, went overboard with a heaving line in an attempt to rescue Johnson, and he was followed at once by Bradford, the third officer. These two succeeded in making the line fast around Johnson, who by that time had collapsed, and he was hauled aboard, and the rescuers followed him.

First aid was attempted and continued for a period of three hours; first, on the number 2 hatch cover and later in the ship's hospital, but the efforts were unavailing, and it became obvious about 10:00 p. m. that death had ensued; whether Johnson was lifeless when brought aboard the ship or not cannot be stated.

There are several specifications of negligence pleaded, and those discussed in libelant's brief are: Failure to launch a lifeboat; failure to maneuver the ship so as to bring Johnson alongside within 30 minutes; failure to have life-lines strung from the poop deck to the midship housing. And finally, although not pleaded, that the bringing of Johnson inboard, when the rescue was effected, was so negligent that his head struck against the ship.

■ That a cause of action exists, for failure on the part of a ship to use due diligence in attempting to save the life of a seaman who has fallen into the sea, has been decided in Harris v. Pennsylvania R. Co. (C. C. A.) 50 F.(2d) 866; Newport News Shipbuilding & Dry Dock Co. v. Watson (C. C. A.) 19 F.

(2d) 832; Salla v. Hellman (D. C.) 7 F.(2d) 953.

It becomes necessary therefore to determine whether due diligence was brought to bear in Johnson's behalf.

Consideration of the testimony, which consists in the narratives of the first, second and third officers, the chief engineer, the boatswain, and eight or nine of the members of the crew, leads to the conclusion that the master used his best judgment in not launching a life-boat until such time as he could be satisfied that it could be done without unnecessary hazard to those who would man and operate it. Johnson was not continuously in sight for the fifty minutes during which he was in the water, and consequently it was not a simple matter to maneuver the ship into a position which would create a lee for a life-boat, in order that it might be safely launched, make its way to Johnson, and safely return to the ship.

Having in mind Captain Lambert's responsibility for the safety of those who would be called upon to conduct that venture, and the testimony of some of them as to the misgivings they entertained while the attempted rescue was going forward, concerning the possibility that a boat could be launched at all, it is concluded that the evidence on this specification lies with the respondent.

Concerning the delay in bringing the ship into a favorable position with respect to the man who was battling manfully for his life in a turbulent sea, it is perhaps difficult to account for the actual lapse of time consumed. The mathematics of the situation, while tending to support the argument of ineptness of navigation, cannot be deemed to point inevitably to a conclusion on the subject. Doubtless there were practical considerations which were more apparent to the master of the ship than can be made manifest from the reading of depositions, or the reception of oral testimony in a court room.

Perhaps such an issue is almost incapable of demonstration, but whether that be true or not, the proof is not deemed to be sufficient on this aspect of the libelant's cause.

The charge of negligence in failing to have life-lines in place requires more extended comment. The argument for the respondent on this subject is to the effect that the men had been ordered not to cross the deck but to use the shaft tunnel during this rough weather and, if the life-lines had been rigged, they would have mutely beckoned a suggestion to disregard those orders.

The difficulty with that reasoning is that it avoids the issue, and is weakened by the testimony that, on the night of July 9th and after Johnson had been carried overside, such life-lines were rigged on the deck between the poop deck and the midships housing. That testimony is contradicted, and no finding can be based upon it.

Concerning the issuance of the orders, there is a pronounced conflict in the testimony. Five of the crew said that they knew of no such orders. Chief engineer Edes, who was a witness at the trial, said that he knew of no such orders, and that he observed none of the men using the shaft alley before the accident. To the contrary effect, is the deposition of the boatswain, Ray Brown, who says that the mate issued the orders to him and that he in turn communicated them to the crew, and that these orders were that the men were to keep off the deck and to use the shaft alley going to and from their quarters, and that on this day he had gone through that tunnel with Johnson.

Burkhart, the first officer, testified that he had issued such orders generally at the beginning of the voyage, in reference to all stormy weather, and specifically in connection with the storm and heavy seas which had prevailed for at least two days prior to July 9th.

Wright deposed that at times the sailors used the shaft alley and at other times the well deck, and that on that particular day he thinks that he did the latter. His testimony on this subject bears repetition; after relating that the men knew that the well deck was dangerous but would still use it, he said:

" * * * My usual habit was, and I think it was Holiman's, also, if we could see well, that is, if it was daylight, and things did not seem to be too rough, we would take a chance on the well deck; if it was dark and we did not know just how much the sea was running we would go down the shaft alley.

"Q. There were no positive instructions against using the well deck if you wanted to? A. I believe that there were some instructions given by either Captain Lambert or Mr. Burkhart, about the use of the shaft alley, but those orders regarding the use of the shaft alley would come and go, maybe for a day or half a day the orders would be quite definite about the shaft alley, and then other days it would ease up; it was a kind of mix-up, and I do not really know whether the crew had been definitely ordered to use the shaft alley at the time Johnson was washed overboard.

"Q. You know, yourself, you were not ordered to use the shaft alley that day, don't you? A. I don't know definitely about that, for the reason, as I said, those commands would come, and then maybe they would be countermanded or not countermanded."

Bradford, the third officer and who was about to go on watch at 5:00 p. m. to relieve the first officer for the latter's supper, did not know whether there were any life-lines on the after well deck that day, but deposed that it was permissible for the crew to use the shaft alley. He did not, however, mention any orders covering this subject, and the same is true with reference to the deposition of Coleman, the second officer.

Skocylas, an oiler, who was the man first overboard to rescue Johnson, did not testify to any orders on this subject, and said it was customary to use either the deck or the shaft alley in going from the men's quarters in the poop deck to the mess-room, and that the men went over the deck frequently, although he saw several of the sailors using the shaft alley.

Holiman, an able-bodied seaman, deposed at length, but his anxiety, plainly expressed, to offer testimony which would be helpful to the government, rather militates against the accuracy of his observations, particularly as he says that storm oil was employed to quiet the sea while Johnson's rescue was being attempted, which is contrary to the fact. He had settled two previous personal injury claims with the Shipping Board, and generally his testimony leaves something to be desired. He said that the men were ordered not to go on deck, and that he himself consistently used the shaft alley.

A careful consideration of all this testimony leads to the conclusion that admonitions rather than orders were relied upon by the master and first officer to persuade the crew not to cross the well deck during such conditions as prevailed on July 9th and had prevailed for two or three days prior thereto, but that no attempt was made to enforce discipline on the subject.

The testimony differs as to the extent fore and aft of the deck space involved. Coleman, for instance, says that it was approximately 150 feet from the poop deck to the men's mess-room, but others put it at about 50 feet; he describes the shaft alley as being about 3 or 4 feet wide and about 10 feet high. It was reached through a vertical shaft from the housing on the poop deck by means of a ladder to the bottom of the ship, a distance of about 35 feet, where the entrance to the

shaft alley was made, and a person so proceeding would walk forward in the alley until he came to the engine-room amidships, and he would then climb up a series of steps or ladders which would enable him to emerge into the mess-room; the shaft alley was lighted, regularly inspected, and was used, as the testimony above quoted indicates, with varying degrees of frequency.

There can be no doubt that on the day in question life-lines were not rigged from the poop deck forward to the midship housing, although Gonzalez, the steward, says that they were, i. e., that there was a line from the after end of the ship, on the starboard side, to the forward end of the well deck, made fast at each end to iron ladders, and that it was a one-inch rope, but no one else for the respondent asserts that this testimony is true.

Brown, the boatswain, deposes that on prior occasions, namely, before leaving Colombo, life-lines were rigged, and that there was bad and stormy weather of about the same character as that prevailing on the day in question. He says that the omission at this time was due to the fact that the monsoon broke during the night, and that the weather was too bad to enable the men to rig the lines. This was known to be the monsoon season in the Indian Ocean, and no good reason is presented why such lines were not rigged in anticipation of such a storm as actually occurred.

Northern, called for the government, deposed that it was the custom aboard vessels of this type to rig life-lines on the open decks when the seas were heavy, to give the men something to hold on to when crossing the decks in rough weather, and that the lines stretched along the center line of the deck, and could have been so rigged on the West Honaker on this voyage, and this seems to be so.

The contention of the government, heretofore referred to, that, if such lines had been rigged, the men would have been encouraged to disregard the so-called orders to use the shaft tunnel, fails for two reasons: (1) It is quite apparent that they did do so even without the life-lines, and this must have been known and observed by the officers; and (2) it would have been a proper precaution to take for the reason that conditions might have developed in the shaft alley (such as need for temporary repairs to the shaft) so that the men could not use the tunnel as a means of access to other parts of the ship; in the event of emergency, they might have been ordered on deck anyhow, and a fair regard

for their safety would have dictated the rigging of the lines.

It is not helpful to speculate as to whether, if such a line had been available to Johnson, he could have grasped it and so saved himself from being washed overboard. Perhaps he could and perhaps he could not, but certainly the opportunity should have been offered to him, and it is therefore found that this specification of negligence is sustained.

The citations relied on by the government do not avail to the contrary:

Holm v. Cities Service Transportation Co. (C. C. A.) 60 F.(2d) 721, involves a choice on the part of the injured man to cross a deck covered with grease instead of using a flying bridge available to him. There was no negligence involved on the part of the ship; the same remark applies to Grunert v. Bush Terminal Co. (C. C. A.) 47 F.(2d) 565; (Hardie v. N. Y. Harbor Dry Dock Corp.) The Cusco (C. C. A.) 9 F.(2d) 545; Johns-Manville v. Pocker (C. C. A.) 26 F. (2d) 204; (Hunt v. Hobbs, Wall & Co.) The Mandalay (C. C. A.) 42 F.(2d) 437.

■ While it is true that Johnson had not been ordered to take the position in which he was exposed to danger, as in Zinnel v. United States Shipping Board E. F. Corp. (C. C. A.) 10 F.(2d) 47, and Boykin v. U. S., 1930 A. M. C. 1551,[1] he was proceeding to his mess-room pursuant to summons, and to that extent he was acting under the ship's discipline, and it is held that in so doing he did not assume the risk of the ship's negligence. This is a finding of fact which may be likened to the verdict of the jury in the case of States S. S. Co. v. Berglann (C. C. A.) 41 F.(2d) 456.

The contention that the decedent was the victim of such inexpert methods of being hauled aboard the ship that he suffered a head injury through contact with the ship's sides, whereby his death resulted, cannot be deemed to have been established. The conditions of the sea, the rolling of the ship, and the natural difficulties presented in bringing the then unconscious man safely inboard, all contributed to what took place. That there were one or more head injuries is quite apparent from the testimony, but the part that they played, in the sad termination of the entire happening, has not been demonstrated.

■ While it is held that Johnson did not assume the risk of the negligence of the ship, the extent to which he contributed to the loss of his life cannot be overlooked. He elected to make his way to the mess-room by using a route which was obviously fraught with danger. He chose the path of peril, in broad daylight, and under circumstances which must have made that choice plain to him. There was another means available to him, of which he knew, and which he had employed that very day, unless the word of the boatswain is to be disregarded.

That there was negligence on the part of Johnson seems so plain as to forbid extended discussion. The duty of the court under these circumstances is like that of a jury in such a case as Cricket S. S. Co. v. Parry (C. C. A.) 263 F. 523.

■ The amount of damages to be awarded is quite difficult of determination.

The decedent was about twenty years of age and had made no contributions to the support of his father, who was a man fifty-seven years of age at the time of the trial. The latter testified that he had a reasonable anticipation that his son would have contributed to his support, if necessity should arise in the future; he has two other sons, the elder of whom is unmarried and who has on occasion helped his father out financially.

The expectation of the beneficiary, according to the mortality tables, was 18.79 years. Whether or not the decedent's earning capacity would have enabled him to contribute regularly and measurably to his father's support, is entirely a matter of conjecture. In the case of U. S. v. Boykin (C. C. A.) 49 F.(2d) 762, a $9,000.00 award, under more favorable circumstances as to evidence of contribution, was reduced by the Circuit Court of Appeals to $5,200.00.

An award here of $5,000.00 would be deemed to be fair and reasonable, so far as the pecuniary loss is concerned. This, however, must be reduced by reason of the negligence of the decedent, by one-half.

Accordingly a decree may be taken for $2,500.00, with costs, to be settled on notice.

If findings are desired, they may be settled on notice, and presented at the same time.

---

[1] Not for publication.