**Louis L. MAIDEN, Libelant,**

v.

**UNITED STATES of America et al., Respondents.**

**No. 27024.**

United States District Court
N. D. California, S. D.

Aug. 3, 1955.

Jay A. Darwin, Robert F. Peckham, San Francisco, Cal., for libelant.

Lloyd H. Burke U. S. Atty., Keith R. Ferguson Special Asst. to the Atty. Gen., Lillick, Geary, Olson, Adams & Charles, San Francisco, Cal., for respondents.

ROCHE, Chief Judge.

The libel in this action sets out three separate causes of action:

(a) The first cause of action for Jones Act, 46 U.S.C.A. § 688, negligence and for the General Maritime remedy of unseaworthiness;

(b) The second cause of action for the General Maritime implied contractual right of maintenance and cure; and

(c) The third cause of action for "unearned" wages to the end of the voyage. (This claim was withdrawn at the trial.)

The facts:

The libelant was making an inspection of the S S Loma Victory's gear, and deck cargo of airplanes at about 4:00 p. m. on January 9, 1953. At about 4:17 p. m., while he was inspecting the anchor windlass, a heavy sea broke over the bow of the ship, striking libelant, and throwing

him against the windlass causing serious personal injuries. At the time of the accident the vessel was making headway with engine revolutions of 50 R. P. M., and the force of the wind was from Force 6 to 7.

█ In order for libelant to recover general damages on his first cause of action, he must sustain the burden of proof that the vessel's personnel were negligent or that the vessel was unseaworthy, proximately resulting in his injuries.

█ The vessel had encountered very bad weather and heavy seas on the seventh, eighth and ninth of January, and therefore the Chief Officer had accompanied inspection parties when they went out on deck. All of the prior inspections, some of which took place in heavier weather than the instant inspection, were conducted without mishap.

The Chief Officer, Murray, testified as follows regarding the appointment he had made with libelant to accompany the inspection party:

"Q. When were these inspections usually made? A. 0800 in the morning, sir, and 1600 in the afternoon.

"Q. And who was present during the course of those inspections? A. The boatswain and carpenter, Sergeant Myers was alone and myself, and sometimes an able seaman— pretty nearly always we had an able seaman with us.

\* \* \* \* \* \*

"Q. And you were present at those inspections? A. I never failed to be in those particular ones on account of the weather, sir.

"Q. On account of the weather? A. On account of the weather conditions. I didn't want a man to go where I didn't want to go.

"Q. Captain, did you see Mr. Maiden, the boatswain, at any time during the afternoon of January 9 regarding anything about inspection? A. Yes, I saw him.

"Q. When and where and what— A. I saw him in his room, and I saw him in the messroom, somewhere between the hours of 3:00 and 3:30.

"Q. What did you say and what did he say? A. To my recollection, it was we would go out at 4:00 o'clock, or 1600, to make the regular inspection. \* \* \*"

The libelant admits that he commenced his inspection on deck without notifying the chief officer and without communicating in any way with the officers and crew members on duty on the bridge of the vessel.

The Second Officer testified that he made visual inspection from the bridge which unfortunately did not reveal libelant or his assistants in view of the limitations of vision caused by the vessel's masts and gear, the deck load of planes, the No. 1 masthouse, and the windlass itself. All that these visual inspections revealed was spray on the decks of the vessel up until the sea came over the bow.

The court is of the view that the wave which broke over the bow of the vessel was unexpected by anyone aboard the vessel. The evidence reveals that the wave which struck libelant was the first wave that had come over the bow of the vessel during the period just prior to and during his inspection. Although the vessel log indicates that seas had come over the bow at times during the watch between noon and 4:00 p. m. on January 9th, the force of the wind had been reducing during the afternoon. The wind at 2:00 p. m. had a force of 8; the wind at 3:00 p. m. had a force of 7; and the wind at 4:00 p. m. was only 6–7. The wind force tends to confirm testimony given that there were no seas coming over the bow during the period near 4:00 p. m. and up until the time the wave came over the bow.

Further the testimony showed that engine speed of 50 R. P. M. was just sufficient for the vessel to make headway or steerageway and that if lesser engine speed had been established the vessel would have wallowed. The evidence fur-

ther reveals that at 4:18 p. m., approximately one minute after the wave struck libelant, the vessel's engine speed was further reduced to 40 R. P. M. but that this speed was insufficient for the vessel to make headway, so that at 4:21 p. m. the engine speed was increased to 55 R. P. M. At 4:25 p. m. the vessel changed course and was able to reduce engine speed to 30 R. P. M. while awaiting instructions from the vessel owners in answer to a request by the master for permission to divert the vessel immediately to Pearl Harbor, so that libelant could obtain further medical care.

On the basis of the above showing, libelant's citation of United States v. Boykin, 5 Cir., 49 F.2d 762, and Brett v. J. M. Carras, Inc., 1952 A.M.C. 1509, affirmed 3 Cir., 203 F.2d 451, are not applicable, in that in this case the vessel was proceeding at as slow a speed as possible all during the course of libelant's inspection. It should also be noted that in the Boykin case the wind was blowing at 80 to 85 miles per hour, and that in the Brett case the vessel was pitching and rolling heavily, and heavy and mountainous seas coming from all directions were sweeping the forward decks of the vessel.

The court concludes that the libelant himself was negligent to a marked degree, which negligence was the proximate and controlling cause of his injuries, in that he proceeded out on deck in violation of orders, failed to notify the bridge of his action, and proceeded to a point forward of the anchor windlass in a fully exposed position, with his back to any possible oncoming sea. The evidence further shows that libelant could have inspected the anchor windlass from a safe position aft of the windlass, where the oncoming sea would have broken itself before reaching libelant. The court can not conclude that the vessel's personnel were negligent in their handling of the vessel or in failing to foresee the onrush of the sea wave coming over the bow.

The court is not impressed with the allegation of unseaworthiness against the vessel. Libelant contends that the cracking of the cement in the hawse pipes created an unseaworthy condition which caused crew members to assume hazardous positions during stormy weather in order to repair and inspect the cement. The only maritime expert to testify at the trial indicated that it was necessary to inspect the cement during heavy weather regardless of whether or not it was cracking. Since libelant was injured while inspecting the cement rather than repairing it, it can not be claimed that such inspection was a contributing cause of the accident which occurred. Libelant also refers to the alleged failure of the vessel to lash the anchor chains together. The court can not see any causal relationship between the accident which occurred and this alleged failure. The maritime expert who testified on this point stated that anchor chains had never been lashed together on any ship which he had served and that it would be bad practice in view of the necessity to lower anchors under emergency conditions or upon arrival at port.

Viewing the entire evidence it is the court's conclusion that there was no negligence on the part of the vessel, or unseaworthy condition existent which contributed to or resulted in injury to libelant, and that libelant has failed to sustain the burden of proof as to both of these positions.

▮ Libelant alleges that past maintenance is due him in the sum of $2,640. Libelant testified that he became an inpatient at the Marine Hospital for the period from March 23, 1955 up to May 4, 1955. He is not entitled to maintenance payments for this period of time. Therefore, the court will allow him maintenance at $8 per day in the total amount of $2,264. In addition libelant is allowed one years future maintenance, without prejudice to his rights to seek further maintenance as and when it becomes due.

In accord with the foregoing

It Is Hereby Ordered that judgment be entered herein upon findings of fact and conclusions of law in favor of libelant

on his cause of action for maintenance and cure in the amounts heretofore enumerated, and

It Is Further Ordered that judgment be entered herein upon findings of fact and conclusions of law in favor of respondent on libelant's causes of action based on negligence and unseaworthiness.