## LEWIS v. UNITED STATES NAV. CO., Inc.

District Court, S. D. New York.
Sept. 11, 1944.

Jacob Rassner, of New York City (Jacob Rassner and Ernest Rassner, both of New York City, of counsel), for plaintiff.

Corydon B. Dunham, of New York City, for defendant.

KNOX, District Judge.

Plaintiff, a seaman, asks damages of $50,000 from defendant as a result of an injury sustained while serving as boatswain aboard

the steamship Charles A. McAllister as she lay at or near a dock in Bone, Africa. He also asks to be awarded the sum of $10,000 for his maintenance and cure. Upon stipulation, the case was tried to the court in the absence of a jury.

The vessel, a so-called "victory ship" owned by the United States, was serviced by defendant pursuant to the terms of an agreement between the United States, acting by and through the War Shipping Administration, and United States Navigation Company, Incorporated, and effective as of September 7, 1942. Such agreements, in a standard form, have been in extensive use throughout the present war. One purpose to be served is to enable the Government, in its far-flung maritime activities, to utilize the facilities and skill of experienced ship operators in such manner, and to such extent as it might prescribe.

The primary question here presented is whether, in the light of the above mentioned agreement, the defendant is liable to plaintiff under the provisions of the Jones Act, 46 U.S.C.A. § 688.

The contract in question designated defendant as the "General Agent" of the United States, and obligated it to manage and conduct the business of vessels assigned to it by the United States from time to time. Other duties imposed upon such agent by the terms of the agreement include the following:

(a) Maintain the vessel in such trade as the United States may direct subject to its order with respect to voyages, cargo, freight charges, etc. In the absence of orders the agent is to follow reasonable commercial practice.

(b) Collect all moneys due the United States and to deposit, remit, disburse and account for the same.

(c) Equip, victual, supply and maintain the vessel subject to direction and inspection of the United States.

(d) Procure the vessel's Master, subject to approval, and the Master when so engaged is to be an agent and employee of the United States and to exercise full control, responsibility and authority with respect to navigation and management of the vessel. The general agent is also required to "procure and make available to the Master for engagement by him such officers and men as are needed to fill the complement of the vessel." These are to be procured through usual channels and according to the customary practices of commercial operators, and upon prevailing terms and conditions in the services in which the vessel is engaged. Officers and men are subject only to the Master's orders and are to be paid in the customary manner with funds provided the General Agent by the United States.

(e) Issue customary freight contracts and bills of lading upon prescribed terms and conditions.

Under Article 14 of the agreement, it is the duty of the General Agent, unless otherwise instructed, to maintain the vessel in an efficient state of repair under the supervision of the United States, and to perform other services not immediately pertinent to the question now before the Court. But, generally speaking, the contract was so drawn that the Government, as the exigencies of war might necessitate, is enabled to apportion responsibility for the operation of the vessels between the General Agent and other organizations more directly engaged in the national war effort.

Following the execution of the agreement, the Charles A. McAllister was assigned to defendant and successfully made one voyage to a foreign port. Upon her return to the United States, she was docked, and defendant's employees, accompanied by her officers and representatives of the government, made an inspection of her condition in order to determine what repairs were needed to maintain her in a sound and seaworthy condition. After being cleaned, the ship, under the direction of defendant, was stocked and equipped for another voyage. Aside from a general knowledge of the service to which she was to be placed, viz., between North America and North Africa, defendant was uninformed as to where she was bound, the date of her departure, the route to be taken, and the specific nature of the cargo to be carried.

On receipt of notice so to do, defendant arranged to send the ship to a Jersey City berth where American Export Lines, a berthing sub-agent, partially loaded her with cargo. Under instructions from the War Shipping Administration, defendant procured tugs and had the vessel moved to Gravesend Bay where a sub-agent placed additional cargo on board. Being informed that the vessel was about ready to sail defendant obtained clearance permitting her to depart for an undisclosed foreign port. From that point on she was solely under the control and management of her Master, acting under orders of the United States

Navy, and defendant was in complete ignorance as to her movements.

As was subsequently learned, she proceeded to Bone, North Africa, where she was discharged by Arab stevedores, working under the supervision and control of British Naval authorities. This operation being completed, the vessel began to prepare for sea. In the course of doing so, her first mate directed plaintiff to top a boom located near No. 3 hatchway. Between it and No. 2 hatchway there was a deck housing built athwartship. It had a length of 24 feet, a width of 5 and a height of about 8. Instead of ordering a subordinate to perform the task, plaintiff elected to do it himself and, in carrying out the operation, found it convenient to get on top of the housing. This, it appears, was strewn with loose dunnage boards, of two by six inches, with a length of about ten feet. They had been placed there by stevedores in order to provide a frame to which a rude fabric shelter to protect them from the weather had been attached. The boards were no longer in use and, instead of having them removed or doing so himself, plaintiff went about his work. As he proceeded, he stepped upon a board that protruded past the edge of the roof of the housing. Beginning to tip beneath his weight, plaintiff realized his predicament, and to avoid falling on winches on the deck beneath him, jumped over them, landing on the deck. The impact was such that he sprained both ankles and sustained a fracture of a bone in one of his heels. It is possible that he suffered one or two other injuries of minor import.

Following the accident, plaintiff was removed to a United States Army Field Hospital on shore nearby, and there received treatment until the ship was ready to depart. He then went aboard and came back to the United States, standing but one watch in the course of the voyage.

On the ship's return to the port of New York, defendant was notified of her arrival by officials of the United States Navy, and thereupon arranged to dock her, and to pay off the crew. Such payment was made in the presence of the Shipping Commissioner, and from a payroll made up by the Purser, and approved by defendant. The top of the payroll bore the printed inscription "U. S. Navigation Co. Inc., Agent, 17 Battery Place, New York, N. Y." The money for meeting the obligations shown thereon was obtained by a draft of defendant drawn on a local bank in which it, as agent, has funds of the United States on deposit.

At this point, the manner in which the ship had been manned prior to her departure from the United States, should be described. As heretofore stated, the Master was selected by defendant, subject to approval by the United States. Such approval being given he became "an agent and employee" of the Government. Defendant then proceeded to make available to him suitable officers and men to compose the ship's company. Slater, first mate on the vessel, testified that he was referred to the ship by the Recruitment and Manning Organization of the Maritime Service, and further, that he knew himself to be an employee of the United States. As respects the procurement of other crew members, including plaintiff, the procedure ordinarily used in peace time was followed. It was this—Defendant notified the seamen's union of its need of men and this information was relayed over a loud speaker to the men then congregated in the Union Hall. Plaintiff, among others, responded. The testimony is somewhat indefinite as to whether the men went first to the ship or stopped at defendant's office en route.

On reaching the vessel, and in the presence of the Shipping Commissioner, the Master signed them on as members of the crew. The articles described defendant as the "operating company on this voyage." Whether plaintiff saw this statement does not appear, but presumably he did. Notwithstanding, he was not told that, in reality, he was becoming an employee of the United States.

In passing, it is to be observed that the present agreement between defendant and the United States differs intentionally from the one that was before the court in Brady v. Roosevelt S. S. Co., 317 U. S. 575, 63 S.Ct. 425, 87 L.Ed. 471, and Quinn v. Southgate Nelson Corp., 2 Cir., 121 F.2d 190, certiorari denied 314 U. S. 682, 62 S.Ct. 185, 86 L.Ed. 546. In each of these cases, the agent was required not only to victual, supply and manage the vessel, but to man it as well. Although the arguments now made to the court stress the difference in the two forms of agreement, the point is not wholly decisive. In each of the cases just cited, and at the time of each of the accidents, the respective defendants had a most substantial measure of control over the operations of the vessel, but in this plaintiff's case, the owner of the ship, or its

naval agency, had deprived defendant of de facto control, and at the time of his injury had substituted itself as operating manager of the ship.

■ Unless, therefore, the plaintiff was unaware that defendant, in servicing the ship, was acting as an agent of the United States, and was without any authority over the vessel once she was on her way abroad, and thus has a right of action by reason of defendant's failure to disclose its principal, I hardly see how he can recover. See Stewart v. United States Shipping Board, D.C., 7 F.2d 676. Nevertheless, it was held in Horan v. Hughes, D.C., 129 F. 248, affirmed, 2 Cir., 129 F. 1005, that an agent who enters into a contract with another, and in his own name, without making disclosure of the name of his principal, may be held to liability thereon. In order to create a valid defense, he must prove that such disclosure was made. No such proof is now before the court. If any exists, it should have been made to appear. Plaintiff, apparently, was without knowledge of the agency agreement between defendant and the United States, and such agreement cannot deprive plaintiff of his rights under his contract of employment. Brady v. Roosevelt S. S. Co., supra. When plaintiff responded to defendant's call for men to man the ship, he was not told of the existing agency, and he had a right to assume, under practices long familiar to seamen, that he was being employed by defendant. The shipping articles signed by plaintiff stated that defendant was the operating company on this voyage and he was entitled to rely upon that statement. In addition, the agency agreement itself provides that the United States will indemnify defendant for such payments as it may be required to pay for maintenance and cure, and for damages for injuries to person or property; a strong indication that defendant fully contemplated that it might be held to personal liability in carrying on its work as an agent, and accordingly, sought to protect itself. For these reasons, defendant's motion to dismiss the complaint will be denied.

The question of the amount of indemnity, if any, to which plaintiff is entitled, and the sum he shall have for maintenance and cure, remains to be determined.

■ At the trial, no evidence of plaintiff's present physical condition was submitted, it having been understood that he would present himself for examination by an impartial physician and that the latter's report, together with the medical testimony now before me, should be the basis of decision on the money aspects of the case. Such testimony will also have a bearing upon the sum which plaintiff should have for his maintenance and cure. Final decision in those matters, for such reason, will have to await a further hearing. But, even so, I shall now express my intention as to what will be done with respect to plaintiff's claim for indemnity. My holding will be that plaintiff's injury was due, in large measure, to his own contributory negligence.

■ He was completely aware of the condition of the top of the deck housing and, as a competent and experienced boatswain, he should have appreciated the danger to which he would be subjected if, in the course of his work, he should chance to step upon a loose board that protruded beyond the roof edge of the housing. Indeed, it is highly probable that in the ordinary course of his duties as a boatswain, he should have seen to it that the boards were removed. For this reason, I have indulged the thought that, perhaps, he should have no recovery of indemnity. What happened here is entirely dissimilar to what occurred in United States v. Boykin, 5 Cir., 49 F.2d 762. The situation here is more nearly comparable to that described in West Kentucky Coal Co. v. Parker's Adm'r, 229 Ky. 685, 17 S.W.2d 753, where the administrator of a seaman was deprived of a recovery by reason of the fact that while acting as mate of a vessel, the seaman gave an order that created a condition that brought about his own death. In the case at bar, plaintiff's failure to order the roof of the housing to be cleared of the boards or to have cleared it himself, was the underlying cause of the accident. However, under the decision of the Supreme Court of the United States, Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L. Ed. 265, the doctrine of assumption of risk is not a defense in a suit brought by a seaman under the Jones Act, 46 U.S.C.A. § 688 and I shall allow plaintiff to recover. There is this further consideration. An officer of the ship stood nearby when plaintiff went on the deck housing. He saw the littered condition of its roof and when he saw that plaintiff was about to proceed with the work, and that he would subject himself to possible danger in doing so, the officer should have directly told him not to

go ahead until the roof was cleared. In other words, the fault of plaintiff and that of the officer should be regarded as concurrent and mutual. Olson v. Flavel, D.C., 34 F. 477. In view of all these circumstances, I think the damages should be apportioned as between plaintiff and defendant and should be divided equally. This, however, is not applicable to plaintiff's recovery for maintenance and cure. Aguilar v. Standard Oil Co., 318 U.S. 724, 60 S.Ct. 930, 87 L.Ed. 1107.