[Civ. No. 13406. First Dist., Div. One. Sept. 16, 1947.]

HARRY W. GUAY, Respondent, v. AMERICAN PRESI-
DENT LINES, LTD. (a Corporation), Appellant.

Treadwell & Laughlin and Raymond M. Farley for Appellant.

Frank J. Hennessy, United States Attorney, and Keith R. Ferguson, Special Assistant to Attorney General, as Amici Curiae, on behalf of Appellant.

Elmer P. Delany, Albert Michelson and Herbert Chamberlain for Respondent.

PETERS, P. J.—Plaintiff, Harry W. Guay, brought this action against defendant, American President Lines, Ltd., to recover damages for personal injuries sustained as a result of the asserted negligence of defendant and its employees. The injuries occurred while plaintiff was employed as an able-bodied seaman on board the vessel "Sea Corporal," a

merchant marine ship owned by the United States and operated by the defendant under contract as "General Agent" of the United States War Shipping Administration. The action was brought under the Jones Act (46 U.S.C.A. § 688), which statute grants to seamen the right to sue their employers in actions such as these. The cause proceeded to trial before a jury and a general verdict was rendered for plaintiff in the sum of $15,000. From the judgment entered on this verdict defendant appeals.

At the threshold of this appeal we are met with the contention that no cause of action here existed against this defendant because, so it is asserted, plaintiff was the employee of the United States War Shipping Administration and not the employee of defendant, and admittedly the employer-employee relationship must exist to warrant an action under the Jones Act. During the war the United States marshalled practically all of the vessels of our merchant marine for war service. Those vessels were acquired, owned, or requisitioned by the Government and operated by various companies under several different types of contracts, and the control over such vessels placed under the jurisdiction of the Administrator of the War Shipping Administration. In some cases the War Shipping Administration built and owned the vessels, while in other cases it requisitioned the vessels and operated them under various types of charter agreements. In the present case the United States and the defendant entered into an agreement designated as "Contract WSA-224," wherein the defendant is designated as the "General Agent" of the United States to manage and conduct the business of vessels assigned to it by the United States. That contract provides, among other things, that the General Agent shall procure the master of the vessel, subject to the approval of the United States; that such master shall be an agent and employee of the United States, with full control in respect to the navigation and management of the vessel; that the General Agent shall procure the men needed to man the vessel through the customary channels used by commercial operators and on terms prevailing in the services in which the vessels are to be operated; that the officers and members of the crew shall be subject only to the orders of the master; that all persons shall be paid in the customary manner with funds provided by the United States. After providing for the compensation

of the General Agent and for the reimbursement of the General Agent for certain expenditures, the agreement provides: "To the extent not recovered from insurance, the United States shall also reimburse the General Agent . . . without limitation, [for] all disbursements for or on account of wages, . . . loss of personal effects, maintenance, cure, vacation allowances, damages or compensation for death or personal injury . . . required to be paid by law."

The defendant argues that under such a contract Guay was not an employee of it, but was an employee of the United States, that it was a mere agent of the United States, and, as such, not liable under the Jones Act. This precise point has been decided adversely to the contentions of defendant by the United States Supreme Court in *Hust* v. *Moore-McCormack Lines,* 328 U.S. 707 [66 S.Ct. 1218, 90 L.Ed. 1534]. Inasmuch as we are here concerned with a federal statute the interpretation of that court is conclusive.

In the Hust case the plaintiff was injured while performing his duties as seaman aboard a Government-owned ship operated by the defendant under a contract identical to the one here involved. The action, as here, was brought under the Jones Act. The complaint, as in the instant case, alleged that Hust was the employee of the agent and was injured through its negligence. The trial court found for plaintiff. The Oregon Supreme Court (176 Ore. 662 [158 P.2d 275]) held, in accordance with defendant's arguments made on this appeal, that, as a matter of law, Hust was an employee of the United States and not an employee of the operating agent, and concluded that an injured seaman had no cause of action under the Jones Act against the operating agent. This holding was reversed by the United States Supreme Court in a four to three decision. The majority opinion was written by Mr. Justice Rutledge and concurred in by Justices Murphy, Douglas and Black. In addition to concurring in the main opinion, Mr. Justice Douglas, joined by Mr. Justice Black, wrote a special concurring opinion in which it was urged that the operating agent was not only the "employer" of the seamen under the Jones Act, but was also the "owner *pro hac vice*" of the vessel. Mr. Justice Reed wrote a dissent in which Justices Frankfurter and Burton joined. The then Chief Justice had died before the arguments in the case were concluded. Mr. Justice Jackson did not participate.

The majority opinion discusses at some length the history and rationale of the Jones Act, and points out how that statute was passed for the purpose of affording seamen adequate protection in situations where such protection was theretofore deemed inadequate. The court then stated (p. 719): "Now it is argued that this favored position was altogether inverted when the government took over control of the entire merchant marine under its war powers in 1942. For it is maintained and the Oregon Supreme Court has held, in effect, that this transfer stripped seamen of many, if not all, of their protections, including the remedy under the Jones Act, for the duration of the war and six months."

The court then discusses at some length the injustices, inconsistencies and complexities that would arise if the views of the Oregon court were adopted, and then stated (p. 722): "We may assume that Congress could authorize so vast a disturbance to settled rights by clear and unequivocal command. It is not permissible to find one by implication."

After some discussion of the Suits in Admiralty Act (46 U.S.C.A. § 741), under the terms of which seamen in the position of Hust are permitted to sue the United States under rules substantially different from those applicable in an action brought under the Jones Act, and after holding that the conferring of that right was not intended to affect rights under the Jones Act, the court continued (p. 723):

"We are told, however, that the Jones Act applies by its specific terms only in the presence of the relation of employer to employee, to give the latter a remedy for the employer's negligence; and, since the effect of the General Service Agreement was to make the seaman technically an employee of the United States, the necessary result was to remit him exclusively to the Suits in Admirality Act for remedy to enforce the substantive right given by the Jones Act.

"The premise is not controlling. We may accept the Oregon court's conclusion that technically the agreement made Hust an employee of the United States for purposes of ultimate control in the performance of his work, although the meticulous differences in this respect between its terms and the corresponding provisions of the Maritime Commission's standard contract make it hardly more than dubious that respondent did not stand *pro hac vice* as employer with the Government. But it does not follow from the fact that Hust

was technically the Government's employee that he lost all remedies against the operating 'agent' for such injuries as he incurred. This case . . . involves something more than mere application to the facts of the common-law test for ascertaining the vicarious responsibilities of a private employer for tortious conduct of an employee.

"Here indeed is the respondent's fallacy, for it assumes the case would be controlled by the common-law rules of private agency. It is true these are applied in the normal everyday applications of the Jones Act. But in those situations this is done to determine who comes within, who without, the covered class in the Act's normal operation, not to exclude that class entirely or in large part. . . . No such application of the common-law 'control' test can be justified in this temporary situation unless by inversion of that wisdom which teaches that 'the letter killeth, but the spirit giveth life.'

"Not always does the law proceed in disregard of that truth. There was nothing to prevent Congress or the President, acting in exercise of their authority, from shifting the technical relation of employer and employee from the general agent to the Government, for purposes relevant to ultimate wartime control of marine employees, without at the same time disrupting their normally applicable rights and remedies. On the contrary, there was every reason why the change should be made without that consequence. No presumption can be indulged that any purpose existed to take away those protections when they were needed more than ever, nor any that so great a disruption would be made for only the emergency of the war period. Nothing in the Jones Act, the Suits in Admiralty Act, or in the War Powers Act of 1941 and the Executive Orders by which the industry's transfer was accomplished compels such a conclusion.''

This case is conclusive on the problem under discussion. In its reply brief defendant argues that the Hust decision is not applicable to the present case because Hust was injured on March 17, 1943, seven days before the effective date of the Clarification Act (50 U.S.C.A. App. § 1291), which became effective March 24, 1943, while in the instant case plaintiff was injured in February, 1944. The Congress, in that statute, was dealing primarily with the rights of injured seamen against the Government, it being provided in quite clear language that seamen in the position of plaintiff, injured on or after October 1, 1941, were entitled to maintain

an action against the Government under the Suits in Admiralty Act, *supra*. It is true that Mr. Justice Rutledge, in his majority opinion in the Hust case, stated (p. 727) : "We need not determine in this case whether prospectively the Clarification Act affected rights of the seaman against the operating agent and others, or simply made sure that his rights were enforceable against the Government. We make no suggestion in that respect. For this case, on the facts, is not governed by the statute's prospective operation." But this observation was immediately followed by the statement that (p. 727) : "It may be noted however that, if respondent's contention were the law, the provisions of § 1, authorizing enforcement of the seaman's substantive rights for injury, maintenance and cure, etc., by the Suits in Admiralty Act remedy, would do no more than reaffirm what the latter Act had provided all along."

Later, in discussing the history and effect of the Clarification Act Mr. Justice Rutledge stated (p. 733) : "The entire history will be read in vain, however, for any clear expression of intent or purpose to take away rights, substantive or remedial, of which the seaman had not already been deprived, actually or possibly, by virtue of the transfer. Whether or not this conserving intent was made effective in the prospectively operating provisions of the Act, it is made clear beyond question in the retroactive ones. Congress was confessedly in a state of uncertainty. But, being so, it nevertheless had no purpose to destroy rights already accrued and in force, whether substantive or remedial in character. Its object, in this respect at the least, was to preserve them and at the same time to provide an additional assured remedy in case what had been preserved might turn out for some reason to be either doubtful or lost."

Thus, while it is true, as contended by defendant, that Mr. Justice Rutledge, in his majority opinion, was dealing with a case involving the retroactive provisions of the Clarification Act, the whole tenor of his opinion leads to the conclusion that the Clarification Act did not prospectively take away the seaman's rights against the General Agent, called by Mr. Justice Rutledge the "operating agent," under the Jones Act. All that the Clarification Act did was to regulate the seaman's rights against the Government, and it in no way, directly or impliedly, affected his rights against the

operating agent. This is made crystal clear not only by the language of the statute, not only by the rationale of the Hust case, but also by all subsequent decisions we have found interpreting the Hust case. In *Bennett* v. *Wilmore S. S. Corp.*, 69 F.Supp. 427, the court held, as a matter of law, that the operating agent was liable, under the Jones Act, to a seaman injured on August 4, 1944, or more than a year after the effective date of the Clarification Act. In *DeWitt* v. *United States*, 67 F.Supp. 61, a similar holding was made in connection with injuries incurred aboard ship on September 13, 1945, or more than two years after the effective date of the Clarification Act. The problem was discussed in *Cohen* v. *American Petroleum Transport Corp.*, 188 Misc. 465 [68 N.Y.S.2d 250], where it was held that an injured seaman, employed under a contract similar to the one here involved, and where the corporation was operating under a contract similar to that here involved, had a cause of action against the corporation under the Jones Act as well as a cause of action under the Suits in Admiralty Act. The court expressly held that the Hust case governed prospective injuries as well as those incurred prior to the effective date of the Clarification Act.

At the oral argument counsel for defendant asserted that the Hust case had, that very day, been overruled by the Supreme Court of the United States in the case of *Caldarola* v. *Eckert,* —— U.S. —— [67 S.Ct. 1569, 91 L.Ed. ——]. Counsel were given the opportunity to file supplemental briefs to discuss the legal effect of that decision. An examination of that case demonstrates to a certainty that it in no way affected, overruled, questioned or limited the majority decision of the Hust case. The Hust case, as does the instant one, involved the rights of an injured *seaman* to sue the operating agent under the Jones Act. The Caldarola case involved the rights of a *longshoreman,* as a business invitee, to sue the *owner* or *possessor* of defectively maintained property. The New York Court of Appeals (295 N.Y. 463 [68 N.E.2d 444]) held that a general or operating agent similar to defendant in the instant case did not own or possess the ship upon which Caldarola as a longshoreman was injured so as to render the general or operating agent liable for injuries sustained by reason of the unsafe condition of the premises. The New York Court of Appeals was of the opinion that the Hust case, determining as it did that the operating

agent was the "employer" of seamen within the meaning of the Jones Act, had no application to the question as to whether the operating agent was the "owner" or "possessor" of the ship under an entirely different statute. At page 466 the New York Court of Appeals stated: "Hust, . . . unlike the present plaintiff, was a seaman. . . . Hust's suit was brought under the 'Jones Act' . . . which gives a seaman a statutory cause of action in negligence against his employer. The majority opinion in the Supreme Court holds only that the Jones Act should be liberally construed so as to give Hust a cause of action thereunder against the 'General Agent.' A concurring opinion by two of the Supreme Court Justices, in the *Hust* case, goes much further and construes the 'General Agency Contract' as putting the agent in possession and control of the ship. Since that minority holding is not the holding of the court, we are not bound to follow it. . . . We find nothing in this record to prove possession or control of the ship in these defendants Eckert, . . . plaintiff has no cause of action against these defendants."

This holding was affirmed by the United States Supreme Court in a five to four opinion. The majority opinion points out that the injury to Caldarola was a maritime tort and, as such, suable in the state courts, and that the determination of the New York courts that a business invitee such as a longshoreman has no cause of action against one who does not control or possess the premises was binding on it. It was urged that the necessary effect of the Hust decision was to make the operating agent the owner *"pro hac vice,"* of the vessel. This contention was rejected. The majority opinion states (p. 1571 [67 S.Ct.]) : *"Hust* v. *Moore-McCormack Lines, supra,* arose under the Jones Act. . . . We there held that under the Agency contract the Agent was the 'employer' of an injured seaman as that term is used in the Jones Act, and a seaman could therefore bring the statutory action against such an 'employer.' The Court did not hold that the Agency contract made the Agent for all practical purposes the owner of the vessel." Thus the majority opinion in the Caldarola case clearly reaffirmed the holding in the Hust case that an operating agent such as defendant was an "employer" within the meaning of the Jones Act, but simply refused to extend that ruling by holding that the operating agent was the "owner" of the ship under a different statute.

That this was the holding of the Caldarola case is made clear not only by the majority opinion in that case but also by the dissents. Mr. Justice Douglas wrote one dissent in which Justices Black and Murphy concurred. Justices Black and Douglas had agreed with the majority opinion in the Hust case, but had, in addition, joined in a special concurring opinion in that case holding that the operating agent was not only the "employer" of seamen under the Jones Act, but also the "owner *pro hac vice*" of the vessel. In their dissent in the Caldarola case these justices, now joined by Mr. Justice Murphy, who had concurred in the majority opinion in the Hust case, reaffirmed their position taken in their concurring opinion in the Hust case, and urged that the operating agent should be held to be the owner of the vessel *pro hac vice* and, as such, liable to a business invitee for the dangerous condition of the ship's appliances.

In a separate dissenting opinion, Mr. Justice Rutledge (author of the Hust majority opinion) agreed "with respondents' counsel and the Court that *Hust* v. *Moore-McCormack Lines* . . . does not rule this case." (P. 1572 [67 S.Ct.].) He pointed out that "The Hust case involved the rights of seamen, not of longshoremen" (p. 1572 [67 S.Ct.]), and that "seamen's rights are not longshoremen's rights." (P. 1573 [67 S.Ct.].) He further stated that: "The question in this case therefore is not one necessarily governed by the same considerations as applied in the cases of seamen covered by the Hust decision." (P. 1573 [67 S.Ct.].)

Thus it is crystal clear from both the majority and dissenting opinions in the Caldarola case that the Supreme Court not only did not overrule, question or disapprove the holding of the Hust case, but accepted the principles therein set out in the majority opinion, and, by necessary implication, reaffirmed them. Thus, the problem is controlled by the Hust case. Under that decision plaintiff herein has a cause of action under the Jones Act against defendant.

■ Defendant objects to the instructions given by the trial court in the instant case on the problem under discussion. The trial court instructed that if the jury found that the defendant had not disclosed to plaintiff that it, the defendant, was acting only as agent of the United States, and that plaintiff was unaware of that agency relationship, then, as a matter of law, plaintiff was an employee of the defendant within the meaning of the Jones Act. No instruction was given based

on the Hust case, apparently for the reason that a petition for rehearing in that case was pending at the time of trial of the instant case. Considerable evidence was admitted on the issues of whether defendant had disclosed to plaintiff the agency relationship and whether plaintiff knew that fact, and from that evidence the jury could have found a failure to disclose, lack of knowledge on the part of plaintiff of the agency relationship, and an honest belief on the part of plaintiff induced by defendant, that defendant was the employer. Prior to the Hust case it had been held that liability under the Jones Act in cases similar to the instant one turned upon the questions of disclosure and knowledge—in other words, it was a question of fact whether defendant disclosed or plaintiff knew of the agency relationship. (*Lewis* v. *United States Nav. Co.*, 57 F.Supp. 652; *Moss* v. *Alaska Packers Assn.*, 70 Cal.App.2d Supp. 857 [160 P.2d 224].) The instruction challenged was undoubtedly based on the rule of these cases. But under the rule of the Hust case defendant, as a matter of law, was the employer of plaintiff as that term is used in the Jones Act. Thus the challenged instruction, while erroneous in that it submitted the issue to the jury, far from being prejudicial to defendant, was far more favorable to it than the rule of the Hust case permits. This being so, defendant cannot complain.

■ Defendant strenuously urges that the evidence is insufficient as a matter of law to sustain the implied finding of the jury that it or its employees were negligent. An examination of the record discloses that the evidence, although conflicting, is ample and substantial to support the implied finding that the accident in which plaintiff was injured was solely and proximately caused by the negligence of defendant's employees. Defendant's real complaint is a dissatisfaction with the rule requiring an appellate court, on factual issues, to sustain a finding based on substantial evidence. The conflict of evidence rule is too well settled to require any defense in this opinion.

Plaintiff was injured on February 26, 1944, while employed as an able-bodied seaman on board the "Sea Corporal," which was then docked at Brisbane, Australia. The evidence most favorable to plaintiff, which this court, as an appellate court, must accept, shows that during the morning of the above-mentioned day it was discovered that there was a leak in one of the gasoline cans or tanks used in a motor-propelled lifeboat. The chief mate, Davis by name, instructed plaintiff and three other seamen—Reynolds, Schutte and Webinger—to re-

move the leaking tank from the lifeboat so that it could be repaired. The tank was of metal, and designed to fit under a cross seat of the lifeboat. There is testimony that it was three to four feet long, nine to eighteen inches thick, and two to three feet wide. Its gasoline capacity was about forty gallons. Empty, it weighed about ten or twelve pounds, and with the amount of gasoline it then contained weighed between three and four hundred pounds.

The plaintiff testified that after he and the three other seamen removed the tank from the lifeboat it was placed upon the boat deck for the mate's inspection. Davis told the men to drain the gasoline into receptacles, but the only available receptacles were two open buckets. They filled those buckets which still left most of the gasoline in the tank. Mate Davis was present throughout these "draining" operations, and, when the attempts to drain the tank were thwarted by the scarcity of suitable receptacles, Davis told the four men that it was dangerous to drain the gasoline into open cans, and instructed them "to put a line around it and lower it over the front of the house to the main deck." Seaman Reynolds, a witness for plaintiff, testified that Davis told them to "Put a line around it, make a line fast around it, place it on the forward rail and lower it over the forward part of the house on the well deck." Seaman Schutte, who also testified for plaintiff, stated that Davis told them that "we would have to take it out of the boat and send it down into town to be repaired and that the best way to do it would be put a line around it and lower it over the rail forward of the amidships house." Mate Davis, who testified by deposition for defendant, admitted that he told the men to "unship it, cast it loose from the boat, and take it out and lower it away over the forward rail down to the main deck." He did not remain to see the work performed.

The tank was removed by the men from its resting place on the boat deck to the position at the rail around that deck at the spot where the mate had directed it be taken to be lowered. The main deck, to which the tank was to be lowered, was two decks below. A rope or gantline about 2½ inches in circumference was then tied around the center of the tank and securely knotted by Reynolds. The four men then lifted the tank onto the rail which ran around the boat deck, and the other three men "steadied" the tank on the upper cylindrical metal rail while Reynolds took the free end of the line over

to a handrail which encircled the deckhouse, across the 6-foot corridor between the deck rail and the deckhouse. Reynolds made two turns of the line around that deckhouse handrail "to secure it as it goes down." He testified that with those two turns around the handrail "you can hold an enormous weight. One man with one hand could hold a tank that way and then you slack it off as the tank goes down and feed your line out." It was Webinger's assignment to hold the tank steady on the rail before the actual lowering began. Reynolds testified that "One man could very easily stand there and steady that. Once it was on the rail it wasn't hard to balance." The other two men—Schutte and plaintiff—were to climb over and "outboard" of the deck rail to aid in easing the tank down onto the main deck. Running around the boat deck, and below the lower pipe of the deck rail, was a metal plating 4 to 5 inches high and ¼ inch thick, called the "fishplate." Its utility was to prevent objects, or "swabbing" water, from falling from the boat deck upon the main deck below. Attached to this fishplate, and between the floor of the boat deck and the lower pipe of the deck rail, was a round roller about 2 feet long, referred to as a "fairlead." It was used to assist in raising and lowering lifeboats to and from the boat deck to prevent the cutting or binding of the ropes.

Schutte climbed over the deck rail at the left end of the tank as it was poised on the rail. He took a position with one foot on the fishplate and the other foot on a ladder attached to a "king post" which stood immediately in front of the boat deck bulkhead. Plaintiff climbed over the rail at the other or right end of the tank as it was poised on the deck rail. He testified that after he climbed over he had both of his feet on the fishplate and both of his hands on the deck rail. He further testified that "I had no sooner got over the rail than the tank slid or came towards me. What caused it, I don't know." Prior to the sliding of the tank he at no time had his hands on the tank. He put his left hand up to try to ward off the tank, but "it just kept coming and I went with it." It is undisputed that plaintiff fell to the main deck about 28 feet below. The seriousness and permanency of his injuries are not disputed. Reynolds testified that there was not "any motion of the ship at all. It was a nice clear day and smooth water." He further said that the tank fell "until it caught up the slack because I hadn't gotten all the slack in and it fell until the weight caught and when I saw it going, immediately I

yanked it and took in the rest of the slack and there it stayed. I would say roughly it fell about six feet.'' He further testified that Schutte and plaintiff had not yet laid hand to the tank before it fell, and that plaintiff's feet were resting on the fishplate at the time that the tank started to fall. It would seem obvious that if Reynolds had taken in all of the slack in the gantline, the only direction that the tank could have fallen would have been back or inboard upon the floor of the boat deck.

It is defendant's contention that plaintiff must have carelessly stepped upon the cylindrical roller attached to the fishplate and, presumably, that it rotated causing him to lose his footing and fall to the main deck. This contention simply disregards plaintiff's testimony that prior to the time the tank fell he had both hands on the rail and both feet on the fishplate and did not have either or both feet on the fairlead.

The evidence is not entirely clear as to what Webinger was doing just prior to the accident in performing his duty of steadying the tank on the rail. He admittedly was not available as a witness at the time of trial. It is a permissible and reasonable inference that he let go of the tank for a moment and it started to fall. Reynolds testified that Webinger grabbed at the tank and tried to catch it and thus forced the tank over towards plaintiff. The other witnesses either could not or did not observe Webinger just prior to the accident. Schutte, the other seaman outside the rail, testified that he thought he had his hand on the tank just prior to its fall and that he then grabbed for it.

There was considerable other evidence, some conflicting with what has been here set forth. It is quite apparent that the jury was amply justified in impliedly finding that the accident was solely and proximately caused by the negligence of either Reynolds or Webinger, or both, in failing to perform properly their functions in the lowering operation. Reynolds admitted that he failed to take up about 6 feet of slack in the rope. Had the slack been taken in, the tank could have only fallen inboard and not outboard. The uncontradicted evidence was that it was a very simple and easy task for Webinger to balance and steady the tank on the rail. It is a permissible and reasonable inference that Webinger negligently failed to perform this task. It is a permissible and reasonable inference that Webinger momentarily let go of the tank and that when it started to fall grabbed for it, as likewise did Schutte, and that either, or both, thus pushed the tank towards plaintiff.

Defendant argues at length that the testimony that the tank fell horizontally towards plaintiff is contrary to the laws of nature for, so it is asserted, an object as heavy as this tank must have fallen directly downward. This argument disregards the facts of this case and the laws of physics. Admittedly, the tank was not full. Obviously, if anything happened to force the gasoline to rush to the right side of the tank as it started to fall, under well-known laws of physics the tank would take the direction in which the mass of liquid was being forced. It is a permissible and reasonable inference that exactly this happened when either Webinger or Schutte, or both, grabbed for the falling tank. That the tank did not fall directly downward is amply demonstrated by the evidence. According to defendant's diagram furnished this court at oral argument, approximately a third of the fairlead roller extended below the tank as it was balanced on the rail. There is no evidence that this roller was in any way damaged in the accident; in fact, defendant's witness Everingham, the purser on the "Sea Corporal," testified that, after the accident, the fairlead was undamaged. Had this tank fallen directly downward it would inevitably have hit the fairlead a crushing blow, and it is a permissible and reasonable inference that, had this occurred, the fairlead would have been damaged. It was not, so that it must follow that the tank did not fall directly downward.

Everingham testified that he interviewed Reynolds and Schutte immediately after the accident and that both told him that plaintiff had stepped on the fairlead roller, slipped, and fell. Everingham produced statements prepared by himself at the time of the interview to this effect, but, admittedly, Reynolds and Schutte refused to sign the statements. Both Reynolds and Schutte testified at the trial that the reason that they refused to sign the statements was that such statements did not correctly set forth what they had told Everingham. Both were positive that they did not tell the purser the facts contained in the statements prepared by him. It is quite evident that the jury chose to believe Reynolds and Schutte and chose to disbelieve Everingham. The implied finding on this issue, under such circumstances, cannot be disturbed by this court.

Defendant makes numerous charges of error in connection with the instructions given and refused by the trial court, contending that some seven instructions given were

erroneous and that the trial court erroneously refused to give some sixteen of its proffered instructions. Most of the sixteen proposed instructions were refused because they were "given in substance elsewhere." An examination of the court's charge demonstrates that the jury was fully and fairly instructed on all of the basic issues involved, and that any minor errors that may have crept into the instructions could not possibly have been prejudicial. Under such circumstances no ground for reversal exists. (*Shuey* v. *Asbury*, 5 Cal.2d 712 [55 P.2d 1160]; *Barlow* v. *Crome*, 44 Cal.App. 2d 356 [112 P.2d 303].)

Defendant objects to the instructions given on the issue of employment, and further contends that its proffered instruction for a directed verdict should have been given for the asserted reasons that there was no evidence of negligence and because, so it is claimed, the United States was the employer of plaintiff. These points have already been determined adversely to the defendant and need not be further considered.

Defendant claims that the trial court erred in refusing to give, on the "given elsewhere" ground, a proffered instruction on burden of proof which, in addition to the usual language employed in such instructions, contained the phrase "the law does not permit you to guess or speculate as to the cause of the accident in question." The jury was fully instructed on the burden of proof, and, while the quoted language undoubtedly correctly states the law, it was not error to fail to mention specifically the jury's incapacity to speculate. Such limitation was necessarily implied in the instructions given.

Objection is made to the trial court's failure to give a proffered instruction that defendant was not liable if the injuries were the result of unavoidable accident. In *Stein* v. *United Railroads*, 159 Cal. 368, at page 373 [113 P. 663], it was held not error to refuse to instruct on unavoidable accident, because "A juror would know that such was the rule without instruction and it would seem absurd to burden the record with a formal statement of a truth so self-evident." In *Gunter* v. *Claggett*, 65 Cal.App.2d 636, at page 642 [151 P.2d 271], the court said that ". . . unavoidable accident is simply another way of urging that defendant was not negligent. The jury has found, and the finding is supported,

that defendant was negligent. No prejudicial error occurred in failing to instruct on this issue.'' The jury was fully and fairly instructed on the general rules of liability for negligence. It has impliedly found that defendant's negligence solely and proximately caused the accident. Such finding is supported by the evidence, and the permissible inferences therefrom. Under these circumstances no error was committed in failing to instruct on unavoidable accident.

■ Defendant complains of the court's refusal to instruct on the ''covered elsewhere'' ground, that ''Shipowners are not obliged to furnish the best, safest, and most convenient equipment or appliances.'' No error was committed in failing to so instruct for the reason that the jury was fully and correctly instructed that defendant was only burdened with a duty of ordinary care.

■ Another technical complaint is made because of the refusal of the court to give an instruction, on the ''covered elsewhere'' ground, to the effect that there was no presumption that defendant was negligent merely because plaintiff was injured. The jury was correctly told that it was the burden of plaintiff to prove the negligence of defendant or its employees. That sufficiently covered the issue.

■ The next objection is to the refusal of the court to give two instructions which, in effect, stated that it was for the jury to determine whether the order of Chief Mate Davis to lower the tank to the main deck with a rope was an exercise of ordinary care on his part for the safety of the men ordered to complete that operation. It should be noted that the jury was charged to the effect that it was within their exclusive province to determine all questions of fact, and that they were the exclusive judges of the weight and sufficiency of the evidence. Such general instructions sufficiently covered the field. The court was under no duty to pick out a particular fact and to instruct the jury on that fact.

■ Defendant next assigns as error the refusal of the trial court to give a series of proposed instructions, on the ''given elsewhere'' ground, to the effect that if the accident was caused solely by the manner in which plaintiff acted in performing his part of the plan, or if plaintiff's own acts were the proximate cause of his injury, or if he consented to the act causing his injury, the verdict must be for defendant. The court fully, fairly and correctly charged the jury

that if the injuries were caused by plaintiff's own negligence and in disregard of his own safety, or if they were caused by plaintiff's act in stepping on the roller, a verdict for defendant should be returned. These instructions adequately covered the issue.

 Defendant next objects to the refusal of the trial court to give four instructions all generally related. The first told the jury that the only particular in which the complaint charged that defendant was negligent was in causing or permitting the tank to topple from the rail, and that the plaintiff could recover only by showing negligence in that particular. The second was to the effect that a verdict could not go against defendant on the theory that it had not supplied plaintiff with a safe place in which to work; the third that plaintiff could not recover on the ground that defendant was negligent in placing the tank on the rail; and the fourth to the effect that plaintiff could not recover on the ground that defendant was negligent in selecting the manner by which the tank was to be lowered from the boat deck to the main deck. In this connection, defendant points out that in his complaint the plaintiff alleged that "the defendants negligently caused and permitted a tank containing gasoline to topple from and fall off of a rail on said boat deck and to strike plaintiff with force and violence, thereby causing plaintiff to fall." It is contended that plaintiff was limited to that specific charge of negligence. That is the general rule. But defendant's application of that rule to the facts here involved is not sound for at least two reasons. In the first place, the allegation of negligently causing and permitting the tank to fall from the rail and thus injuring plaintiff, is broad enough to permit evidence of negligence in any particular leading up to the toppling or falling of the tank. In the second place, an examination of the record discloses that the facts in reference to the place of work, placing the tank on the rail and the selection of the manner of lowering the tank were fully and completely inquired into by both parties on the trial. The defendant offered an abundance of evidence in an attempt to show the reasonableness of its actions in these respects. The law is well settled that even where issues are not specifically alleged in a complaint or other pleading, if evidence is introduced on those issues without objection, such issues are properly involved in the case. The objection may not properly be made for the first

516

time on appeal that such issues were not presented by the pleadings. (*McAllister* v. *Union Indemnity Co.*, 2 Cal.2d 457 [32 P.2d 650, 42 P.2d 305]; *Northwestern M. F. Assn.* v. *Pacific W. & S. Co.*, 187 Cal. 38 [200 P. 934]; see cases collected 14 Cal.Jur. p. 974, § 62.) That rule is clearly applicable to the problem under discussion.

 The defendant next complains of seven of the instructions given by the court at the request of plaintiff. The first of these stated the general import of the Jones Act. It informed the jury that the action was being brought under that act, and that under that statute a seaman can sue his employer for work-incurred injuries resulting from the negligence of the employer or his employees, ''or by reason of any defect or insufficiency, due to the negligence of such employer in such employer's appliances, boats or other equipment.'' Defendant argues that this instruction, in effect, told the jury that it could find for plaintiff if the jury found that the failure to have sufficient containers in which to drain the gasoline from the tank was negligence. It is urged that this issue was not pleaded, and there was no evidence that ships were customarily so equipped. The defendant reads into the instruction something that is not there. After reading the entire record we are convinced that the jury could not possibly have interpreted the instruction as does defendant. The instruction was obviously a preliminary one and was simply a correct abstract statement of the general import of the statute under which the action was brought. It is quite obvious from the record that the case was tried on the theory that the basic question involved was whether the defendant's employees were negligent after the tank was placed on the rail. No feasible possibility exists that under the questioned instruction the jury could have thought it could find negligence in the failure to possess sufficient containers in which to drain the gasoline.

 Defendant objects to an instruction that stated that merely because plaintiff was technically a Government employee that did not mean that he had ''lost all remedies against the operating agent, . . . the American President Lines, Ltd.'' Defendant challenges, in particular, the use of the words ''operating agent.'' Inasmuch as under the Hust case plaintiff was entitled to an instruction that defendant was the employer of plaintiff as a matter of law, no possible

prejudice could have resulted to defendant by the use of the challenged words. Obviously, the words, even if erroneous, which they were not, could have prejudiced defendant only if the nature of the relationship were one of fact. It is quite significant that the majority opinion in the Hust case repeatedly refers to the company in the position of defendant as the "operating agent."

▪ Objection is next made that the court instructed that defendant had pleaded and contends that plaintiff's injury was the result solely of his own negligence, and that contributory negligence operated only in mitigation of damages and not as a bar—the so-called doctrine of "comparative negligence" applicable in maritime law. Defendant urges that it never pleaded contributory negligence, which implies negligence on the part of defendant, but simply pleaded that the accident occurred solely because of the negligence of plaintiff. Defendant argues that if it established its "sole negligence" defense, that would bar plaintiff's recovery, and the jury should have been so instructed, and that it was error to instruct on contributory negligence which was not pleaded. The jury was fully instructed that if the plaintiff's injuries were the sole result of his own negligence or lack of caution, or slipping on the roller, it should find for defendant. Thus it is clear that no substantial harm could have been suffered by defendant by the court's designation of its "sole negligence" plea as one of "contributory negligence." ▪ Moreover, it would seem that when a defendant pleads "sole negligence" of plaintiff as a defense, such plea puts into issue both the question of whether the accident occurred solely by reason of the negligence of plaintiff, and whether the accident was caused by the alleged negligence of defendant and plaintiff, so that under such a plea it is proper to instruct on contributory negligence.

▪ Objection is also made to an instruction to the effect that if the jury found that defendant negligently failed to provide plaintiff with a safe place to work and with safe appliances, and that such proximately caused the accident, a verdict for plaintiff should be rendered. It contends that those issues were not pleaded by plaintiff. This point has already been passed upon adversely to defendant in that portion of this opinion discussing the refusal of the trial court to give four defendant-proposed instructions which

sought to take the "place of work" and "safe appliance" issues out of the case. As there pointed out, not only were the allegations of the complaint broad enough to include the issues, but such issues were fully litigated by the parties. That being so, it was proper to instruct on such issues.

Defendant next objects to an instruction in which the jury was told that it need not pay any attention to the fact that plaintiff had also brought suit against the Government (in which action plaintiff had pleaded he was an "employee" of United States), because if there is recovery in this suit the plaintiff would be debarred from recovering in that suit. It is urged that the federal pleading should have been considered by the jury as impeachment of plaintiff's testimony that he had never been told that his employer was the United States. That point would be important only if that question were at issue. But since, under the Hust case, plaintiff was entitled to an instruction that for the purposes of the Jones Act he was defendant's employee as a matter of law, the fact that he alleged in the federal suit that he was the employee of the United States, which was also true, is totally immaterial.

Defendant also objects to an instruction given by the court in which it was stated that the defense of assumption of risk by the employee was not available to the employer. It is not asserted that the instruction did not correctly state the law, but it is contended that the defense was not pleaded, was not in issue and must have confused the jury. Under the Jones Act such a defense does not exist, and, this being so, it was proper for the court to so inform the jury.

The last contention of defendant is more meritorious. The complaint pleaded the injury on February 26, 1944, and, among other elements of damage, pleaded that plaintiff was then earning $350 per month, plus board and lodging, reasonably worth $75 per month, and that as a result of the accident he was unable to work from February 26, 1944, until November 14, 1944. It is then prayed that as a result of this, and other elements of damage, plaintiff was damaged in the sum of $25,000. The jury, as already pointed out, brought in a general verdict of $15,000. The jury was several times instructed that the value of plaintiff's time during his period of disablement was a proper item of damage. During the trial the defendant offered documentary evidence to prove that between May 4, 1944, and November 15, 1944, there was paid

to plaintiff as maintenance the sum of $539. The evidence was excluded and the exhibits introduced only for purposes of identification. It is alleged that this was error. There can be little doubt but that this evidence should have been admitted. The complaint pleaded loss of earnings for the period in question and the proffered proof would have demonstrated that there was not a total loss of earnings during that period. Plaintiff cannot secure double recovery for this item of damage. While it is true that the right to maintenance is statutory, and such remedy is "independent and cumulative" with that conferred by the Jones Act (*Occidental Ind. Co.* v. *Industrial Acc. Com.*, 24 Cal.2d 310, 312 [149 P.2d 841]; see, also, *Pacific S. S. Co.* v. *Peterson,* 278 U.S. 130 [49 S.Ct. 75, 73 L.Ed. 220]), that does not mean that double recovery may be had for the same item of damage. All that is meant is that an action under the Jones Act and an action for maintenance may be maintained separately or together. This was clearly recognized in the Occidental case, *supra,* where at page 323 the court stated: "To avoid double recovery for the same injury and the compensable factors thereof where both remedies were sought before the statute of limitations had run, the appropriate tribunal could offset one against the other to the extent that they overlapped."

To hold that because the seaman has two independent and cumulative remedies for a portion of the same injury that he can recover twice for this item would violate elementary principles of logic and fair play. The cases clearly indicate that no such right exists. (*John A. Roebling's Sons Co. of New York* v. *Erickson,* 261 F. 986; *Haugen* v. *Oceanic Fisheries Co.,* 21 F.Supp. 572—Dist. Ct., W. D. Washington; *Muise* v. *Abbott,* 160 F.2d 590; *Royle* v. *Standard Fruit & Steamship Co.,* 52 N.Y.S.2d 407 (aff. 54 N.Y.S.2d 778).) While it is true that defendant did not plead these payments as an offset, and that it would have been better practice to have done so (*Vitagraph, Inc.* v. *Liberty Theatres Co.,* 197 Cal. 694 [242 P. 709]), that was not indispensable under the circumstances. It is at least reasonably arguable that such evidence can be admitted under a general denial. (See cases collected 25 C.J.S. p. 780, § 142.) Moreover, no objection was made on this ground, the trial court ruling that the evidence was not admissible because the plaintiff expressly waived any claim for hospital expenses or doctor bills, which were paid for by the Government, and evidently believed this excluded

any damage for "maintenance" as well. Plaintiff did not ask for hospital expenses or doctor bills, but he had specifically pleaded a total loss of earning power for the period in question. He had put that issue into the case. He offered evidence that he was hospitalized during that period and had not worked. He offered evidence that his earning power was so much before the accident, and totally cut off during that period. The defendant should have been permitted to show that in fact plaintiff "earned" through "maintenance" paid to him the sum of $539.

This error does not require a reversal. Plaintiff does not contend that he was not paid the $539, but, in fact, admits that he received this sum. He not only consents, but suggests, that if it was error to exclude this evidence (which he, of course, denies) the judgment should be reduced by the amount involved. We agree with this suggestion.

It is therefore ordered that the judgment be modified by striking therefrom the sum of $539, and the trial court is directed to enter its judgment in the amount of $14,461. As so modified the judgment is affirmed. Plaintiff to recover costs on appeal.

Bray, J., and Ogden, J. pro tem., concurred.

A petition for a rehearing was denied October 14, 1947, and appellant's petition for a hearing by the Supreme Court was denied November 13, 1947.