## CAFIERO & MENCACCI v. NAVIGAZIONE LIBERA TRIESTINA, S. A.

## WILLIAM A. CAMP & CO. v. SAME.

## BENNETT DAY IMPORTING CO., Inc., v. SAME.

### Nos. 9777, 9786, 9857.

District Court, E. D. New York.
April 8, 1931.

Harry D. Thirkield, of New York City (Gregory S. Rivkins, of New York City, of counsel), for libelants.

Loomis & Ruebush, of New York City (Philip A. Donahue, of New York City, of counsel), for respondent.

INCH, District Judge.

The above three suits were duly tried together, the proofs being offered consecutively, the order being, testimony in the Cafiero case first, then the proof in the Bennett Day case, and lastly the proof in the William A. Camp & Co. suit. One decision will suffice.

A somewhat similar series of suits relating to the same ship and same voyage as here, but brought by different libelants and relating to different merchandise, was tried in the District Court, Southern District of New York. The Carso, 43 F.(2d) 736.

In those cases the court, among other things, found that the shipowner, having given clean bills of lading for cargo known to be in poor condition, was estopped to assert as against the consignees that the damage occurred before the goods were delivered into its custody and that libelants had made out a prima facie case against the steamship and were entitled to a decree.

It likewise decided that the notice clause in the bills of lading, which are the same as the bills in the cases before me, must be considered as an entirety, and was unreasonable and therefore invalid.

However, the facts as to the carrying of the merchandise in the three cases before me are different from the Southern District cases, and must be decided upon the evidence given at the trial.

A great deal of the testimony was presented by means of depositions and by documents, and, before finding the facts as to the individual shipments, there are certain facts applicable to all the cases which I find as follows:

The Carso is a steel, single screw, steamer, built nine years ago, and was less than four years old when the voyage in question took place. Her gross tonnage was over 6,200 tons and dead weight capacity 9,100 tons. The voyage in question had begun at Genoa on September 23, 1926, at which place she had received some cargo. She then proceeded to another port, where further cargo had been received on or about September 25, and then came to Naples, where all of the cargo in the three libels before me was received. The Carso had a 100-A-I classification, and had been duly inspected a few months prior to the commencement of this voyage. She had likewise been in drydock for the purpose of this inspection and for making minor repairs, and had been duly declared seaworthy.

After she had been loaded with libelants' cargo and other merchandise, she sailed from Naples on October 10, 1926, and proceeded direct to New York, where she arrived on the night of November 6, 1926.

After the usual harbor inspection, she proceeded to her pier No. 3, Erie Basin, where she tied up about 11 o'clock the following day, November 7, 1926.

Her trip over from Naples (26½ days) had taken somewhat longer than usual (18 to 20 days), and this is sufficiently accounted for by the fact that, after she had been out about 10 days, and on or about October 21, she ran into a severe storm, which was accompanied by gales and heavy seas. She then had the misfortune during this storm

to have trouble with her circulating pump, which had to be repaired at sea under these adverse conditions. About a week later, on October 29, she encountered a second storm of even greater severity than the first; the wind reaching hurricane force. Finally, on November 5, a day from New York, she encountered still another storm, which was accompanied with high seas, rain, and wind.

According to her captain, an experienced man, these series of storms were unusually severe. It can be easily inferred that she rolled and tossed considerably.

There was nothing, however, indicating extraordinary peril or any such situation as is sometimes relied upon as an excuse for injury to cargo.

Likewise, in each of the cases before me, the libelants produced clean bills of lading, and claim that the shipowner was negligent in stowing the various merchandise of libelants, causing, by such carelessness, damage to consignees' merchandise by contact with decayed cheese in one instance (Cafiero shipment), and with cherry brine or some similar salty substance in the other cases (the Bennett Day and Camp & Co. shipments).

The burden of proving such negligence rests upon libelants, and they each are obliged affirmatively to establish such negligence on the part of the carrier before they can recover.

The libels are drawn to cover any possible damage, and upon the trial it appears that the amount claimed is greatly exaggerated. In the Cafiero case, relating to 1,250 cases of canned tomatoes, the libel claims $2,000, damage, but proctor for this libelant in his brief states that the amount of damage will be less than $500, representing the reconditioning of the cases and relabeling of same.

In the Bennett Day libel, consisting of 3,500 bags of nuts, the sum of $10,000 is claimed, but at the trial proctor for libelant states that this damage amounts to less than $200, and the proof shows that out of over the 3,500 bags of nuts only 26 bags were found to be damaged in any way; this being slightly more than half of 1 per cent. of the entire shipment of nuts for this consignee.

In the Camp case, relating to approximately 3,200 bags of nuts, the same claim of $10,000 is made, but proctor for libelant asserts the damage to be something in the neighborhood of $2,000, while the proof here likewise indicates that, after certain bags were sent to the federal warehouse for reconditioning, only a few bags were found to be damaged, an equally small proportion of the entire shipment to this consignee.

Bearing the above in mind, we can now take up the individual shipments, and I will do so in the order of proof already mentioned.

The Cafiero case relates to some 1,250 cases of canned tomatoes. There were 500 cases containing 48 cans each, 750 cases containing 24 cans each. These cases were about 18 inches wide and 15 inches high. At the bottom of hold No. 1 was stowed four tiers of these cases of cans of tomatoes, then was put some dunnage and mats, and then, on top of this, was stowed a large number of cases of this cheese which has already been the subject of controversy in the Southern District.

The cheese was contained in cases 3 feet long, about 2 feet deep, and altogether there were about eleven tiers of these cheese cases, bringing them pretty near to the deck of the 'tween deck. On them some more dunnage was placed, and on top of this was placed some of the bags of walnuts and filberts which are in controversy in the Bennett Day and Camp & Co. shipments.

The temperature at Naples was about 82 degrees. The course of the ship and the rough weather encountered caused her to continue in the Gulf Stream and remain in its vicinity longer than usual. The result was that, when the cases of canned tomatoes were delivered at New York, there seems to be little, if any, dispute that damage had been sustained by them by staining, which required reconditioning and relabeling. The cause of this damage consisted of animal fat or grease which had leaked out from the cases of cheese above and down and upon the cases of tomatoes beneath.

Briscoe, a marine surveyor, at the pier at New York, terms this animal fat as "seepage from the cases of cheese"; that the "cheese was painted with this animal fat as a protection."

It is plain that the cases of canned tomatoes were so stowed that, in the event of such leakage, the cargo beneath had no protection at all from it. In fact, so far as I can see, all the witnesses for the ship, Monta, the captain, Schoffel the first officer, and others, indicate this source of this damage to the cases of tomatoes.

Cocks, a surveyor witness for the ship, likewise states that he found some of the cases of canned tomatoes covered with this "grease." He states that he found "40 cases stained with

grease and 234 cases covered with grease and vermin." In other words, "75 per cent of stain was due to sweat and 25 per cent to grease from the cheese," of those he found affected, "476 cases" of the 1,250 "being sound and unaffected."

While the burden of proof to show negligence rests upon libelant, The Isla De Panay (C. C. A.) 292 F. 723, yet, before the respondent can avail itself of exceptions in its contract where merchandise is shown to have been received in good order and condition and delivered in bad order and condition, respondent must show a seaworthy vessel, and that the merchandise was properly stowed in a proper berth. The Thomas P. Beal (C. C. A.) 11 F.(2d) 49. It must satisfactorily explain these matters. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; Kaufer v. Luckenbach (D. C.) 294 F. 978. Such proof cannot be supplied by speculation. Herman v. Compagnie Generale (C. C. A.) 242 F. 859. It has been said that a doubt in regard to these matters should be resolved in favor of the shipper. The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688.

It is not necessary here to decide the exact extent of damage. It is sufficient if I find that some damage due to negligence was caused.

■ According to Briscoe, and I so find, it was improper stowage to place this cheese in the way it was placed on the top of the cases of canned tomatoes, considering the temperature and all the surrounding circumstances of the proposed voyage and the reasonable result, which should have been anticipated, occurred, which could have been avoided by the exercise of ordinary care and skill on the part of those in charge of the stowage of this merchandise.

■ As to the failure to comply with the notice clause of the bill of lading, I shall follow the decision of the District Court, Southern District. Shreve v. Cheeseman (C. C. A.) 69 F. 785–790. The bills before the Southern District Court are identical with the bills here. The ship arrived November 7, 1926. Briscoe examined the goods on the pier, and found the damage on or about November 16, 1926. Cocks, the expert for the ship, did the same on November 18, 1926, both examinations taking place while the ship was at the pier. On November 20, 1926, proctor for libelant notified the proctor for the ship by telephone of the proposed filing of a libel, and received a confirmatory letter on November 22, 1926 (Libelant's Exhibit 6), and on December 1, 1926, the libel was duly filed. The D. Harvey (D. C.) 139 F. 755; Anchor Line v. Jackson (C. C. A.) 9 F.(2d) 543–545.

■ Accordingly, as to this shipment, because of improper stowage and negligence, libelant is entitled to a decree, the amount of damage to be determined later.

■■ The next case is that of Bennett Day, and both this and the case of Camp & Co. have substantially the same facts. Both of these consignments consisted of bags of walnuts and filberts. These were stowed in the 'tween decks, and the damage claimed by libelants consisted of staining of the bags; the controversy being as to the nature of the stain. Libelant claims that this arose from leakage from barrels of cherries in cherry brine which was stowed near by. This is directly controverted by witnesses for the ship. In each of the suits the actual amount of damage due to staining from any cause appears to be nothing out of the ordinary, considering the weather encountered by the ship, the reasonable time contemplated for her voyage, and all the circumstances thereof.

It has been held in regard to perishable cargo that there is a certain normal loss to be expected. The Florinda (C. C. A.) 31 F.(2d) 262. While this does not apply to a covering such as bags, the proportion of damage here to the entire shipment is an element that can properly be considered on the question of whether there was negligence.

Briscoe, for the libelant, who examined the bags of nuts and found certain of them stained, gives his opinion that these stains were caused by cherry brine leaking from the barrels.

Cocks, the surveyor for the ship, is equally positive that the stain was caused by "sweat," of which he found evidence within the decks of the ship. Both tested the stains, and there is an absolute contradiction in the testimony of these two expert witnesses.

It is my opinion, after considering all the testimony, that the libelants in question have failed to prove, by a fair preponderance of evidence, the cause of the staining of these bags of nuts, and that the same was due to cherry brine and negligence.

On the contrary, it seems to me that, in spite of all reasonable precautions and due care, the comparatively few bags of nuts were stained by sweat and under circumstances which show it could not be avoided, however carefully they had been stowed.

Accordingly, in these two libels (Bennett Day and William A. Camp & Co.), the libelants have failed to prove a cause of action, and the libels must therefore be dismissed.

I direct a decree in favor of libelants Cafiero & Mencacci, with costs, and the usual reference. I dismiss the libels of Bennett Day Importing Company, Inc., and William A. Camp & Co., with costs.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723) findings of fact and conclusions of law in accordance herewith may be submitted.

Settle decrees on notice.