## THE MAUI.

### No. 9350.

Circuit Court of Appeals, Ninth Circuit.
Aug. 2, 1940.

Joseph C. Sharp, Lloyd M. Tweedt, and Derby, Sharp, Quinby & Tweedt, all of San Francisco, Cal. (Charles L. Hemmings, of San Francisco, Cal., of counsel), for appellants.

Herman Phleger, Maurice E. Harrison, and Moses Lasky, all of San Francisco, Cal. (Brobeck, Phleger & Harrison, of San Francisco, Cal., of counsel), for appellees.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Libelants appeal from a decree in favor of the steamship "Maui" in a suit for damage to cargo. The vessel and her owner will be referred to herein as appellee.

On October 26 and 27, 1936, appellants delivered on board the Maui at San Francisco quantities of fruit and other perishable foodstuffs for transportation to Hawaii. The commodities were in good order and condition to carry safely for the contemplated voyage, which ordinarily required seven days. The steamer was scheduled to leave at noon of October 27. After the goods were loaded, and during the afternoon of the 27th, the Maui left the dock to which she had been berthed

and went into the stream for the two-fold purpose, as the court found, of loading a quantity of dynamite at the powder anchorage in San Francisco bay, and of facilitating completion of her crew, some of whom had quit the vessel shortly before she left the dock. Because of labor difficulties ensuing, the Maui was compelled to anchor in the bay and she remained at anchor until February 5, 1937.

In the meantime part of appellants' cargo spoiled and was dumped overboard. The remainder, mostly in a deteriorated condition, was unloaded when the labor troubles ended on February 5.

Libelants pleaded the failure of appellee to perform the contracts of carriage. They alleged, further, that the ship, after being loaded, commenced her voyage but later anchored in the bay, whereupon appellants made unavailing demands for the discharge of their goods.

In its answer appellee admitted the damage and the failure to discharge the cargo as requested, but denied negligence. By way of defense it set up exceptions contained in the bills of lading, the principal one relied on being the following: "Carrier shall not be liable for any loss or damage resulting from: * * * detention or accidental delay; prolongation of voyage; riots; strikes, lockouts, stoppage or shortage of labor, labor rules, or labor troubles"; and that "carrier shall not be liable for loss or damage caused by: * * * inherent vice or nature of the goods."

The general maritime strike commencing in October, 1936, and raging for more than three months thereafter, provides the background of the litigation. A number of collective bargaining contracts between shipowners and various maritime and longshore unions of the Pacific Coast area were due to expire September 30, 1936. There had been negotiations for new agreements, resulting in deadlocks. Through efforts of the U. S. Maritime Commission a threatened walkout was averted for the time being, but by the middle of October a stalemate was again reached. The unions fixed upon midnight of October 28 as the deadline for the successful termination of the Commission's efforts to effect a settlement. The day to day developments in the controversy were matters of public notoriety, and there can be no doubt that when appellants booked space on the Maui they were aware that a general strike, while not of certain occurrence, was within the possibilities, and that "quickie" strikes characteristic of the disturbed situation were apt to occur without warning.

When libelants' goods were loaded the Maui had a complete crew, but shortly before the vessel left the dock the unlicensed members of her deck crew, 12 in number, quit the ship. As the Maui was in the act of moving into the stream the entire unlicensed engineroom crew, consisting of 21 men, swarmed ashore through the loading ports. The lines had been cast off, the vessel was under way and it was not possible again to fasten her to the dock. Next day the entire steward's department left the ship and on October 31, the remainder of the crew, with the exception of the master and chief engineer, did likewise. There was no abatement of the trouble and at midnight of October 29, the strike became general.

After the Maui had anchored and before the general strike began, repeated but unavailing efforts were made to obtain a crew. The unions—the sole source through which men were procurable—gave continued assurance that seamen were being or would be sent aboard. While the men failed to materialize, the situation was nevertheless such as to make it appear probable that a crew would presently be recruited. On the morning of October 28 appellee notified shippers that the vessel had been unable to depart because of lack of crew and was unable to move, but that as soon as a new crew was obtained the vessel would start on her voyage. Later that day, or the next, appellants demanded the return of the vessel to the dock for the purpose of unloading. In reply, appellee called attention to the impossibility of moving the ship in the absence of a crew.

1. Appellants complain of the dispatch of the Maui from the dock and of the failure to return her there as requested. The criticism has in it much of the wisdom that comes after the event. The court found, and we are not disposed to disturb the finding, that the dispatch of the Maui to the powder anchorage was a move reasonably calculated to enable her to complete her crew; that appellee used all diligence in the premises, and, until the general strike commenced, its

representatives were warranted in believing, as they did, that a crew would be obtained.

■ It is well to remember that a duty was owing cargo owners other than appellants and that the primary obligation of the ship was to fulfill the contracts of carriage. Moreover, the proof warrants the finding that after the ship reached the anchorage she was unable to obtain a crew such as would make it possible for her either to commence her voyage or return to the dock, or to provide steam to power the winches, and that the use of tugs would have been a dangerous as well as an impracticable expedient. After the commencement of the strike, of course, the cargo could not have been discharged had a return to the dock been effected.

■ 2. No affirmative proof was offered of the general seaworthiness of the vessel. Although they have not suggested any item of unseaworthiness—aside from lack of crew—which might be thought contributory to the loss, appellants contend that before a bill of lading exemption is available to appellee it must first prove that the Maui was in all respects seaworthy, or that due diligence had been exercised to make her so. The rule is said to be established by Martin v. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65, and other decisions cited, most of which are by the lower federal courts.[1]

We think otherwise. Appellee does not invoke the Harter Act.[2] It is not seeking statutory exoneration but relies on its contracts of affreightment. The court found that no element of unseaworthiness contributed in any degree to the damage. And it was stipulated that: "the delay in voyage of said vessel and detention of said cargo for the period of time involved was the sole cause of such decay resulting from the inherent nature of the cargo, and such decay was not at all caused by the care given or by any lack of care on the part of respondents on board said vessel to preserve said cargo while on board."

The pertinent clause in the bills of lading does not purport to relieve the ship from the consequences of its own negligence. Its aim, rather, is to avoid what would otherwise be the liability of the carrier as an insurer. The facts clearly establish as the cause of the damage the delay in shipment. And the delay, in turn, was shown to have been the consequence of an excepted cause, not involving negligence on the part of the shipowner.

■■ The applicable rule is that of the Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 517, 72 L.Ed. 901, in which the court said that "unseaworthiness alone * * * displaces the contract of affreightment only in so far as damage is caused by the unseaworthiness." And as said in The Isis (May v. Hamburg, etc., Gesell-schaft), 290 U.S. 333, 354, 54 S.Ct. 162, 168, 78 L.Ed. 348, "Unseaworthiness viewed as a condition of exemption stands upon a different footing from unseaworthiness viewed as a subject of a covenant." When appellee proved that the loss arose from an excepted cause, it discharged the burden resting immediately upon it. The Malcolm Baxter, supra, 277 U.S. page 334, 48 S.Ct. 516, 72 L.Ed. 901; United States v. Los Angeles Soap Company, 9 Cir., 83 F.2d 875.

■ 3. Appellants claim that the Maui was unseaworthy for lack of a full crew when she broke ground. They contend, further, that the conduct of the carrier in commencing the voyage while the ship was unseaworthy constituted a voluntary deviation, rendering appellee liable as an insurer.

The ship, as has heretofore appeared, did not commence her voyage. There was no more in the movement of the vessel than a shift from one loading place to another. Whether the Maui was seaworthy for the purpose of the port maneuver is to be determined from the nature of the movement, Martin v. The Southwark, supra; International Navigation Company v. Farr, etc., Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830; and it can hardly be said she was insufficiently manned for this limited purpose. It will be recalled that the engineroom crew was still intact when the lines were cast off and the vessel moved into the stream. Appellee exercised proper diligence in these respects, and obviously the removal

---

[1] Kaufer Co. v. Luckenbach S. S. Co., 294 F. 978, D.C.W.D. Wash.; American Co. v. United States, 26 F.2d 468, D.C.S.D. N.Y.; The Benjamin Noble, 232 F. 382, D.C.E.D. Mich.; The Poznan, 276 F. 418, D.C.S.D.N.Y.; Cafiero & Mencacci v. Navigazione Libera Triestina, 50 F.2d 199, D.C.E.D. N.Y.

[2] 46 U.S.C.A. §§ 190–192.

of the ship to the powder anchorage, where she would have gone in any case, in no way contributed to the delay in the prosecution of the voyage.

Affirmed.

HANEY, Circuit Judge, concurs in the result.