[Civ. No. 21643. Second Dist., Div. One. Feb. 4, 1957.]

ASPEN PICTURES, INC. (a Corporation), Appellant, v. THE OCEANIC STEAMSHIP COMPANY (a Corporation) et al., Respondents.

Leonard Horwin and Richard I. M. Kelton for Appellant.

Brobeck, Phleger & Harrison and Samuel L. Holmes for Respondents.

FOURT, J.—This is an appeal by the plaintiff from a judgment on a verdict rendered in favor of defendants in an action by the shipper of goods against the carriers for damages resulting from a delay in the carriage of plaintiff's goods.

Plaintiff delivered to defendants, who are common carriers, certain motion picture equipment and supplies for shipment to Samoa on defendants' steamship "Sierra," which was scheduled to depart from the port of Los Angeles on May 24, 1952, and to arrive in Samoa at the end of the first week in June. The material was needed by plaintiff in connection with its production of a motion picture in Samoa, commencing in mid-June. Plaintiff's executive producer, together with a part of the cast and crew, departed by air for Samoa on May 22, 1952. The goods were loaded on board the Sierra on May 24, 25 and 26. A seamen's strike delayed the sailing of the vessel, with the result that plaintiff was delayed approximately six weeks in commencing production of its motion picture.

For some time prior to the time plaintiff's goods were loaded on board the Sierra, the Sailors Union of the Pacific and the Pacific Maritime Association, defendants' bargaining agent, had been negotiating a new collective bargaining contract. On May 23, 1952, the union adopted a resolution, which was communicated to defendants, that effective immediately the men would refuse to sail any of defendants' vessels except those certified by the United States Military Transport Service to be carrying military cargo to Korea, and that a strike vote would be taken on May 26, unless an agreement with defendants' collective bargaining agent were reached by that time. Also on May 23, 1952, the Union's representatives informed defendants' representatives that none of their ships would be permitted to sail for an indefinite period. No agreement was reached between the Union and the defendants' bargaining agent and accordingly, a coast-wide strike vote was taken and carried on May 26, picket lines were established the following day and maintained thereafter, and no cargo could be removed from defendants' vessels without the consent of the union. No notice was given by defendants to plaintiff regarding the labor dispute, the work stoppage or the threatened strike until May 28, when defendants notified plaintiff that the ship was delayed by reason of the strike.

It is plaintiff's contention that knowing the importance to the shipper of timely delivery of the cargo, defendants were negligent in failing to notify plaintiff of the likelihood of a work stoppage and in failing to take initiative on their own to stop the loading of the cargo onto a ship that was already under work stoppage and threatened with imminent strike.

Defendants contend that the terms and conditions of the contract of carriage are set forth in the bills of lading and that plaintiff is bound by the terms thereof; that the Carriage of Goods by Sea Act (hereinafter referred to as COGSA) is specifically incorporated in the bills of lading and that under the provisions of section 4(2)(j) of that act[1] defendants are exempt from liability.

---

[1]Section 4(2)(j) of the Carriage of Goods by Sea Act (U.S. Code, title 46, Section 1304; 49 Stats. 1210) reads as follows:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from——

.   .   .   .   .   .   .   .   .   .

"(j) Strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general: *Provided*, That nothing herein contained shall be construed to relieve a carrier from responsibility for the carrier's own acts;"

The dock receipts for plaintiff's goods were prepared by Barnett International Forwarders, Inc., on behalf of plaintiff, for execution by defendants at the time of receipt of the goods. The receipts contain the following language printed thereon: "THE GOODS ABOVE SPECIFIED WERE RECEIVED UPON THE UNDERSTANDING, AND SHIPPER BY ACCEPTING DUPLICATE DOCK RECEIPT AGREES, that except as otherwise provided herein the custody and carriage of said goods by the Oceanic Steamship Company shall be GOVERNED BY THE CONTRACTUAL TERMS AND CONDITIONS OF THAT COMPANY'S REGULAR FORM OF BILL OF LADING, before as well as after its issuance. . . . During any time that the goods are in the custody of the Company prior to loading, the Company shall hold them as warehousemen only and in the event of loss or damage during such time shall not be subject to the burden of proof prescribed by Section 4(2)(Q) of the Carriage of Goods by Sea Act."

After the goods were loaded on board the Sierra, and in exchange for the dock receipts, Oceanic Steamship Company issued its bills of lading which provided, in pertinent part, as follows: ". . . THE SHIPPER BY RECEIVING THIS CONTRACT BILL OF LADING AGREES that the custody and carriage of the goods are subject to the terms and conditions provided herein and the authorities and liberties granted hereby, AS SET FORTH ON THIS AND ON THE REVERSE SIDE HEREOF, whether written, stamped or printed, which shall govern the relations, whatsoever they may be, between the Shipper, Consignee and Cargo Owner and the Carrier, Master and Vessel in every contingency, wheresoever and whensoever occurring." The reverse side of the bills of lading contain the following provisions, among others:

"2. This bill of lading shall be deemed to incorporate and shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, and nothing herein contained shall be deemed a surrender by Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder; nor shall Carrier be deemed to have warranted the seaworthiness of the Vessel. The provision stated in said Act shall (except as may be otherwise provided herein) govern before the Goods are loaded on and after they are discharged from the ship and throughout the entire time that they are in the custody of the Carrier. In respect of goods carried on deck and stated herein to be so carried, all risks of loss

or damage by perils incident to such carriage shall be borne by Cargo Owner but in all other respects the custody and carriage of such goods shall be governed by the terms of this bill of lading and the provisions stated in said Carriage of Goods by Sea Act notwithstanding Section 1(c) thereof. Carrier shall also have the benefit of Sections 181 to 189, inclusive, of Title 46, U.S. Code, and of all other statutes of the United States or any other country which may be applicable in the circumstances to grant Carrier exemption from or limitation of liability.

:  .  .    •    •    •    •    •    •  .  •    •    •    •    •

"12. Carrier does not undertake that the Goods shall arrive at port of discharge, destination or transshipment at any particular date or time or to meet any particular market or in time for any particular use. Scheduled or advertised sailing and arrival times are only expected times and may be advanced or delayed if Carrier shall find it necessary, prudent or convenient to do so."

Pursuant to the provisions of the Intercoastal Shipping Act (46 U.S.C.A., §§ 843-848) and the regulations promulgated thereunder, defendant Oceanic Steamship Company, hereinafter referred to as Oceanic, filed with the United States Maritime Commission its tariff, in which a copy of Oceanic's bill of lading is set forth in full.

Plaintiff urges as grounds for reversal that there was prejudicial error in the giving of certain instructions and in the admission of evidence.

■ Plaintiff contends that the following instruction was erroneous:

"The Oceanic Steamship Company is a common carrier under the laws of the United States. As a common carrier it is required by law to treat all customers alike. For that purpose it was required to file with the Federal Maritime Board a freight tariff setting forth rates and the bill of lading containing terms and conditions under which it will carry goods of any shipper. The filing of such a tariff is regarded in the law as a public notice to all customers or shippers of all of the terms and conditions under which the company may carry the goods of any shipper. It is prohibited by law from varying from the published tariff, for to do so would result in a discrimination between shippers. Therefore the plaintiff is presumed to have notice of the tariff, as filed, and the terms and conditions set forth therein.

"The bill of lading is the form of contract under which

goods could be carried by the steamship company. If the form of the bill of lading issued by the Oceanic Steamship Company was published in full in its freight tariff, the plaintiff is presumed to have known all of its terms and conditions. Therefore, the plaintiff is presumed to have known that the defendants could not legally guarantee to carry the plaintiff's goods to its destination at a particular date or time or in time for any particular use.

"These presumptions of knowledge or notice on the part of plaintiff are conclusive and you may not find that plaintiff did not have such knowledge or notice, if you find that the form of bill of lading was filed as part of the defendant's tariff."

Plaintiff argues that (1) the terms and conditions of the bill of lading were not binding upon the shipper merely because they had been filed with the Federal Maritime Board as a part of the carrier's tariff and (2) even if it be determined that plaintiff was bound by the terms of the bill of lading which the law required the carrier to file with the Federal Maritime Board, plaintiff was not bound by the exemption clauses contained in the bill of lading since they are not a part of the tariff, citing *Pacific S. S. Co.* v. *Cackette*, 8 F.2d 259, and *Bernard* v. *U. S. Aircoach*, 117 F. Supp. 134.

There was no error in the foregoing instruction. The same contention was advanced by plaintiff in its motion for a new trial and the trial court in its memorandum of ruling on that motion correctly stated the law as follows:

"It is undisputed that the defendant Oceanic filed its tariff (Exhibit "D") with the United States Maritime Commission. This it was required to do by the provisions of the Intercoastal Shipping Act (46 U.S.C.A. § 844; see also §§ 845b and 801), and by the federal regulations promulgated pursuant thereto (Tariff Cir. 3; 13 Fed. Reg. 709; Code of Federal Regulations, title 46, part 231). ■ It is clear from the decisions of the federal courts that shippers are chargeable with constructive notice of the terms and provisions of tariffs and related rules and regulations to the extent, and only to the extent, that the same have been filed pursuant to the requirements of applicable federal law. As stated in *Pacific S. S. Co.* v. *Cackette*, 8 F.2d 259:

" 'It may be conceded that, by virtue of the reference to a *lawfully published tariff*, every passenger who travels by means of a ticket such as that which is here involved, is chargeable with notice of everything contained in such pub-

lished tariff schedules which is by law required to be therein inserted, and that such a provision becomes part of the contract of transportation. *Missouri, K. & T. R. Co.* v. *Harriman,* 227 U.S. 657 [33 S.Ct. 397, 57 L.Ed. 690]; *Boston & Maine R. R.* v. *Hooker,* 233 U.S. 97, 113 [34 S.Ct. 526, 529, 58 L.Ed. 868, L.R.A. 1915B 450, Ann.Cas. 1915D 593]. In the case last cited, the court said: "It follows therefore, from the previous decisions in this court, that, if it be found that the limitation of liability for baggage is required to be filed in the carrier's tariffs, the plaintiff was bound by such limitation," and the court made express reference to the notice which follows from the filed and published regulations "as required by the statute and the order of the Interstate Commerce Commission."

. . . . . . . . . . . .

" '. . . The public, in dealing with a common carrier, are bound to take notice that it has filed a tariff of rates and charges, and are chargeable with notice of everything that is properly included in or related to such system of rates and charges. Rates for passenger transportation may be, as the court found in the Hooker Case, directly affected by the degree of the carrier's responsibility for safe carriage and delivery of baggage. . . .' (At pp. 260-261.)

"In the light of the foregoing, we must examine the Federal law to determine to what extent the defendant carrier was required to file and publish the rules and regulations which it set forth in its contracts with its shippers, that is to say in its form bill of lading. The Intercoastal Shipping Act (46 U.S.C.A. §§ 844 et seq.) applicable in this case by virtue of the provisions of section 845b provides in part as follows:

" 'Every common carrier by water in intercoastal commerce shall file with the United States Maritime Commission and keep open to public inspection schedules showing all the rates, fares, and charges. . . . The schedules filed and kept open to public inspection as aforesaid by any such carrier . . . shall also state separately . . . any rules or regulations which in anywise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, or charges, or the value of the service rendered to the passenger, consignor, or consignee. . . .'

"The same section of the federal statute provides that the Maritime Commission shall by regulation prescribe the form and manner in which the schedule required shall be published, filed and posted.

"The regulations as promulgated by the commission (13

Fed. Reg. 709) restate the requirements with respect to the filing of schedules of rates, fares, and charges, and further require that such schedules 'shall state separately each terminal or other charge, privilege, or facility, granted or allowed, and any rules or regulations which in anywise change, affect, or determine any part of the aggregate of such rates, fares, or charges, or the value of the service rendered to the consignor, consignee, or passenger. . . .' The regulation defines tariff as 'a publication containing actual rates, fares, charges, classifications, rules, regulations, and practices of a common carrier for transportation by water.'

■ "The tariff as filed by Oceanic sets forth the entirety of the bill of lading verbatim. Paragraph 2 thereof not only incorporates by reference the provisions of the Carriage Of Goods By Sea Act, but further states with respect thereto as follows: 'The provisions stated in said Act shall (except as may be otherwise provided herein) govern before the goods are loaded, on and after they are discharged from the ship, and throughout the entire time that they are in the custody of the carrier.'

"Paragraph 12 of the bill of lading filed as a part of the tariff reads as follows:

" 'Carrier does not undertake that the goods shall arrive at port of discharge, destination, or transshipment, at any particular date or time, or to meet any particular market, or in time for any particular use. Scheduled or advertised sailing and arrival times are only expected times and may be advanced or delayed if carrier shall find it necessary, prudent or convenient to do so.'

"Among the incorporated provisions of the Carriage of Goods by Sea Act are the following:

" 'Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from——. . . (j) Strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general: *Provided*, That nothing herein contained shall be construed to relieve a carrier from responsibility for the carrier's own acts; . . .'

"It is the conclusion of the court that the regulation purporting to immunize the carrier from liability for loss or damage resulting from strikes or stoppage or restraint of labor is of such a character that it was required to be included as a part of published tariff and that accordingly the public is chargeable with notice of its existence and effect.

"The regulations dealt with in *Pacific S.S. Co. v. Cackette,*

8 F.2d 259, and in *Bernard* v. *U.S. Aircoach,* 117 F.Supp. 134, were of a procedural rather than a *substantive* character, purporting only to require the filing of a notice of claim of loss, they had 'no perceptible relation to rates and charges for transportation.' In contrast, the regulation here involved, designed as it is to exonerate the carrier from liability for loss due to specified causes is *substantive.*

"It seems clear that freight rates may be affected by the degree of the carrier's responsibility for the goods shipped. It is equally clear that any limitation upon such responsibility has a bearing upon 'the value of the services rendered' by the carrier."

Plaintiff also asserts that it was prejudicial error for the court to give the following instructions:

(a) "By the terms of the bill of lading involved in this case and by the terms of a federal statute called the Carriage of Goods by Sea Act, it is provided that neither the carrier nor the ship shall be responsible for loss or damage arising from or resulting from strikes or lockouts or restraints of labor. This means that the common carrier is granted a general immunity from liability for any loss or damage suffered by a shipper which results from strikes or restraints of labor.[2]

(b) "A shipping company does not insure that cargo will be delivered according to schedule and is not automatically liable as an insurer in case of delays in shipment."

(c) "As to the issue of negligence, plaintiff has the burden

---

[2]Plaintiff has quoted only a portion of this instruction, the balance of which reads as follows:

"This general rule of immunity, however, is subject to the limitation or qualification which I shall now state to you

"The common carrier owes to the shipper the duty to exercise ordinary care in the handling of the shipper's property so as to avoid causing the shipper loss or damage, and the duty also to inform the shipper of any fact or facts which are known to the carrier but unknown to the shipper and which a person of ordinary prudence in the carrier's position would recognize as being likely to cause a substantial delay or detention of the shipper's goods beyond the usual time in transit. The reason for imposing the latter duty upon the carrier is to afford the shipper in such circumstances the opportunity to exercise his own judgment as to whether to make the shipment or to make other arrangements.

"The standard of care required of the carrier in the performance of these duties is that of ordinary or reasonable care. Neither the terms of the bill of lading nor the terms of any federal law operates to relieve a carrier of liability to a shipper for damage proximately caused by a breach of either of the duties which I have just defined. If you find that the defendant carrier in this case was negligent in respect to the performance of its duty to plaintiff, as I have defined that duty, and if such negligence was the proximate cause of damage to plaintiff, then plaintiff is entitled to recover."

of proof; that is to say, the burden is upon the plaintiff to prove negligence on the part of the defendants by a preponderance of the evidence.''[3]

It is plaintiff's contention that (1) the applicable statute is the Harter Act (46 U.S.C. § 190) and not COGSA, and (2) the foregoing instructions erroneously put the burden upon plaintiff to prove negligence whereas the burden was upon defendants to prove that the strike was the cause of the damage and that they were not negligent in failing to give the shipper notice of the likelihood of delay.

There is no merit in these contentions. ■ With reference to the contention that the Harter Act is the applicable statute, that act is superseded by COGSA in domestic commerce at the option of the carrier when the bill of lading contains an express statement that it shall be subject to the Carriage of Goods by Sea Act (46 U.S.C.A. § 1312). In the instant case, the dock receipts specifically provide that the custody and carriage of the goods shall be governed by the contractual terms and conditions of Oceanic's regular bill of lading, and the bills of lading expressly incorporate the provisions of COGSA. ■ Moreover, the Sierra did not leave the port of Los Angeles, and the Harter Act does not apply in any event until the vessel ''breaks ground'' to start her voyage. (*The Newport*, 7 F.2d 452; Knauth, Ocean Bills of Lading, fourth ed. (1953) p. 166.) Plaintiff's goods were discharged and returned to it before the voyage was commenced.

With respect to the instruction as to the burden of proof, plaintiff alleged in its complaint that it caused its goods to be delivered to defendants at their dock on May 19, 20 and 24, 1952; that the seamen represented by the Sailors Union of the Pacific went on strike at about 9 p. m. on May 26, 1952, against the SS Sierra, and others; that on May 28, 1952, plaintiff was advised by defendants that the Sierra was delayed by a maritime strike and had not sailed; that following said advice and notice, plaintiff made strenuous efforts through the Government of American Samoa, and other authorities, to cause the Sailors Union of the Pacific to permit the

---

[3]The balance of this instruction, which precedes the part quoted by plaintiff, reads as follows:

''Negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, actuated by those considerations which ordinarily regulate the conduct of human affairs. It is the failure to use ordinary care in the management of one's property or person.''

"SIERRA" to sail, but without avail; that on or about June 26, 1952, having obtained permission from the Sailors Union of the Pacific to remove its goods from the Sierra, plaintiff transferred them to another vessel. These allegations were admitted by defendants.

It was undisputed, therefore, that the delay in the sailing of the Sierra was caused by the strike. Under the express provisions of the bills of lading and COGSA, defendants were exempt from liability for damages caused by such delay unless plaintiff proved that defendants' negligence contributed to the damage. (*The Mangalia*, 69 F.Supp. 688, 693; *American Tobacco Co.* v. *The Katingo Hadjipatera*, 194 F.2d 449, 450; *The Maui*, 113 F.2d 1018, 1020.) As stated in *George F. Pettinos, Inc.* v. *American Export Lines*, 68 F. Supp. 759, 761: "Section 4 of the Carriage of Goods by Sea Act establishes sixteen exceptions from liability. If the loss is caused by one of the enumerated exceptions, the carrier will not be held liable unless it appears that its negligence contributed to the damages, and the burden of proof upon that issue is upon the libellant."

Plaintiff argues strongly that defendants had the duty of notifying the shipper of the likelihood of a strike. In its brief plaintiff asserts that "in the instant case there was a factual conflict about the need for notice." By their verdict the jury impliedly found that defendants were not negligent in failing to give notice or in loading plaintiff's goods aboard ship. Plaintiff has failed to show that there is no substantial evidence to sustain the implied findings of the jury.

Plaintiff maintains the following instructions erroneously relieved the carrier from the unlawful acts of its servants and created a presumption in favor of the carrier that its employees would obey the carrier's orders and sail the ship:

(a) "Seamen who have signed written shipping articles for a voyage work under different conditions from workers on shore and are governed by different rules. The laws of the United States require seamen to sign articles promising, during the voyage, obedience to all lawful commands. When articles are signed by a crew for a voyage, all bargaining, individual or collective, is ended for the duration of the voyage. After such articles are signed there exists no right to strike. A strike by seamen under such circumstances is in violation of law. Sailors who have signed lawful articles and have

undertaken a voyage have no right to strike or to refuse to sail the ship.''

(b) ''For sailors to breach shipping articles by engaging in a strike or work stoppage and refusing to sail a vessel would be an unlawful act. The Criminal Code of the United States provides that whoever, being a member of the crew on a vessel of the United States on any waters within the admiralty jurisdiction of the United States (and that includes Los Angeles Harbor), resists or prevents a master of a ship in the free and lawful exercise of his authority in command of the ship is guilty of a revolt and a mutiny. Whoever, being a member of the crew of such a vessel, endeavors to make a revolt or mutiny or combines, conspires or confederates with any other person on board the ship to make such a revolt or mutiny, or solicits, incites or stirs up any other of the crew to disobey or resist the lawful orders of the master or other officer of the ship or refuse or neglect their proper duties on board the ship is guilty of the crime of inciting revolt or mutiny.''

(c) ''The abandonment of duty by a seaman, after signing articles, by quitting the ship before the termination of his engagement, without justification and with the intention of not returning, is desertion, for which a seaman may be punished under statutes of the United States.''

(d) ''There is a presumption that the ordinary course of business will be followed and that the law will be obeyed.''

. We cannot agree with plaintiff's construction of these instructions. Plaintiff has quoted only a part of the foregoing instruction (d), the balance of which reads as follows: ''However, it is for the jury to decide, in the light of all the facts and circumstances shown by the evidence, whether the defendants had knowledge of such facts that in the exercise of ordinary care they should have foreseen that a substantial delay in the sailing of the Sierra was probable.'' The court then gave the following instruction: ''If, in spite of the fact that the seamen on the Sierra were under shipping articles, the defendants had knowledge of such other facts that in the exercise of ordinary care they should have foreseen the probability of a strike or work stoppage which would be likely to cause a substantial delay or detention of plaintiff's property, defendants were under a duty to take such actions with reference to plaintiff and plaintiff's property as a person of ordinary prudence would be expected to take under the same circumstances.''

█ As stated in *Perbost* v. *San Marino Hall-School*, 88 Cal.App.2d 796, at page 801 [199 P.2d 701] : "The virtue of one instruction cannot be determined by extracting it from the context of the entire charge to be criticized as if it alone were given. . . . █ The correctness of all the instructions given in a cause can be determined only by such reasonable construction as will enable a judge to ascertain their probable effect upon the jury in the light of the issues raised by the pleadings. (*Guay* v. *American President Lines*, 81 Cal.App. 2d 495, 513 [184 P.2d 539].)

█ ". . . In considering an instruction assigned as prejudicial the reviewing court must adopt such construction thereof as will support the judgment rather than one that will defeat it, if the one adopted is susceptible of such interpretation. (*Mullanix* v. *Basich*, 67 Cal.App.2d 675, 681 [155 P.2d 130].)" Considering the instructions in the light of the foregoing rules, it appears obvious that the instructions were directed to the issue of whether defendants were negligent in failing to notify plaintiff of the work stoppage and threatened strike.

Plaintiff also asserts that the court erred in its instructions on agency, and particularly in instructing the jury that Barnett International Forwarders, Inc., was plaintiff's agent for certain limited purposes. We find no error in the instructions complained of. There is evidence that plaintiff hired Barnett to prepare export declarations, obtain export licenses and to handle the documentation of the goods through customs. Mr. Santiestevan, the secretary of Barnett, testified that he prepared the export declarations and dock receipts; that his company paid the Federal Transfer Company for delivering plaintiff's goods to the dock, and was reimbursed by plaintiff; that Barnett also paid an invoice from defendant Matson Navigation Company for freight charges on plaintiff's shipment, and received the bills of lading and copies of the export declarations from the Matson Company. █ The jury was properly instructed that "The burden of proving an agency, as well as the scope of the agent's authority, rests upon the party who asserts the existence thereof and who seeks thereby to charge the principal with the knowledge, acts or omissions of the agent."

█ Plaintiff complains of the following instruction: "You are instructed that though a person may not have actual knowledge of certain facts, but if he has knowledge of sufficient facts to cause a reasonably prudent person of

ordinary intelligence to make inquiry, the law will impute knowledge of those facts which may be easily ascertained by reasonable inquiry. When the law imputes knowledge, it has the same legal effect as though there was actual knowledge.''

Plaintiff does not claim that the instruction was an incorrect statement of the law but maintains that it was prejudicial error for the court to admit into evidence issues of the Los Angeles Times of May 24 and May 25, 1952, containing on the front pages thereof accounts of the work stoppage and impending strike and that this instruction together with such evidence was sufficient to permit the jury to infer erroneously that plaintiff had knowledge of the strike and therefore defendants had no obligation to give actual notice.

In our opinion the admission into evidence of the newspapers, if error, was not prejudicial and the instruction, when considered with other instructions given, would not have misled the jury. The jury was fully instructed as to the duty of a carrier to inform the shipper of any fact or facts which are known to the carrier but unknown to the shipper and which a person of ordinary prudence in the carrier's position would recognize as being likely to cause a substantial delay. (See footnote, p. 249.)

Instructions are to be read and considered as a whole and so considered, ''if it appears therefrom that the jury were fairly and fully instructed on all the law applicable to the facts in the case, the judgment will not be reversed simply because the particular instruction, taken alone, may not have embodied all the law applicable.'' (*Anderson* v. *Seropian*, 147 Cal. 201, 217 [81 P. 521].)

As stated in *Henderson* v. *Los Angeles Traction Co.*, 150 Cal. 689, at page 699 [89 P. 976]: ''Where numerous instructions are given (as in this case) it may well be that some particular instruction fails to contain a complete or accurate statement of the law. If, however, when the entire charge is examined the omissions or inaccuracies in a particular instruction appear to have been supplied, and the jury fairly and consistently instructed, generally, as to the law, this is sufficient to defeat any claim of error predicated on defects in particular instructions.''

Whether errors in instructions were prejudicial must depend upon the closeness of the case on its facts, nature of the erroneous instructions and of other instructions given and other factors. (*Pullen* v. *Heyman Bros.*, 71 Cal.App.2d 444, 453 [162 P.2d 961].) Also, unless, upon a considera-

tion of the entire case, including the evidence it appears that the error complained of has resulted in a miscarriage of justice, judgment will not be reversed by reason of an erroneous instruction. (*Perbost* v. *San Marino Hall-School, supra,* 88 Cal.App.2d 796, 801; *Radisich* v. *Franco-Italian Packing Co.,* 68 Cal.App.2d 825, 843 [158 P.2d 435].) In our opinion, considering the instructions as a whole, the jury was fairly and fully instructed and there was no prejudicial error.

Plaintiff contends that the court erred in (a) admitting evidence of a claimed custom of seamen not to strike when they had signed foreign articles, and refusing to allow cross-examination of the witnesses regarding this testimony, and (b) admitting evidence of a custom of not insuring or guaranteeing the arrival or departure of a vessel.

■ On direct examination one of defendants' witnesses was asked the following question: "Now, in your experience, 20 years in the shipping business, Mr. Hudson, have you ever known of a vessel upon which the sailors, that is, the unlicensed deck department, had signed foreign articles and undertaken a voyage where they then subsequently went on strike and refused to sail the ship?" Plaintiff's objection, upon the ground that it did not tend to prove or disprove any issue in the case was overruled, and the witness replied that he did not recall any such incident. A similar question was asked of three other witnesses, with the same reply. One of the issues was whether defendants were negligent in failing to notify plaintiff of the likelihood of a strike and the evidence related to whether defendants could reasonably rely on the probable fulfillment of the obligation of the sailors under their articles. The trial court's ruling was correct.

■ Plaintiff was not denied its right of cross-examination of these witnesses. The trial court properly sustained defendants' objection to plaintiff's question as to any instances where sailors after having signed foreign articles were prevented from striking by reason of having signed such articles. The question clearly called for the witnesses' conclusion.

■ Plaintiff's contention that the trial court, over its objection, erroneously admitted evidence, of a custom of not insuring or guaranteeing the arrival or departure of a vessel is also without merit. Plaintiff's witness, Mr. Warth, testified that Mr. Carter, defendants' freight agent, assured him the Sierra would sail on the 24th. The trial court sustained

plaintiff's objection to the following question asked of Mr. Carter: "Is there any custom or practice in the shipping industry with respect to assuring or guaranteeing departure or arrivals of vessels?" The witness was then asked: "Mr. Carter, do you recall of any instance in your experience in the shipping business when *you* assured or guaranteed either an arrival or departure date of a vessel?" (Emphasis added.) The witness replied: "I recall no instance in my experience in the shipping game where I have ever guaranteed a sailing or guaranteed arrival. That is basic in this business. It's the thing that you cut your eye teeth on in the shipping game, and I did not give such an assurance, such a guarantee." The witness further testified that he did not assure or guarantee to Mr. Theron Warth or any other representative of plaintiff in any conversation that the SS Sierra would sail on a certain date or would arrive in Samoa on a certain date. There was no error in the court's ruling.

Finally, plaintiff contends the trial court's denial of a new trial for defendants' wrongful interference with the jury was erroneous. Plaintiff, on its motion for new trial, submitted an affidavit of one of the jurors that during a recess, while standing with another juror at the drinking fountain, Mr. Paul N. Carter, district freight agent for defendant Matson Navigation Company, caught their attention, smiled, shrugged his shoulders, and said: "Now you see what we have to cope with." We agree with the ruling of the trial judge that the alleged misconduct on the part of the witness Carter was not of such a character that it could reasonably be deemed to have had any effect upon the verdict of the jury.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied March 4, 1957, and appellant's petition for a hearing by the Supreme Court was denied April 2, 1957.